[S. F. No. 19164. In Bank. Mar. 2, 1956.]

STATE COMPENSATION INSURANCE FUND et al., Plaintiffs and Appellants, v. F. BRITTON McCONNELL, as State Insurance Commissioner, etc., Respondent; INDUSTRIAL INDEMNITY COMPANY, Intervener and Appellant.

Donald Gallagher, Loton Wells, McFarland, Laumeister & Ferdon, Edward R. Young and John F. O'Hara for Plaintiffs and Appellants.

McFarland, Laumeister & Ferdon for Intervener and Appellant.

Edmund G. Brown, Attorney General, and Harold B. Haas, Deputy Attorney General, for Respondent.

Robert Minge Brown, James B. Donovan, Sidney L. Weinstock, Weinstock, Anderson & Chase, and McCutchen, Thomas, Matthew, Griffiths & Greene as amici curiae on behalf of Respondent.

McCOMB, J.—Plaintiffs (State Compensation Insurance Fund and six California insurance companies) filed an action against defendant (the California Insurance Commissioner) for declaratory relief, injunction and mandamus, to prevent a certain order changing the present system of rating workmen's compensation insurance premiums from becoming effective.

Another California insurance company, Industrial Indemnity Company, intervened as plaintiff.

From a judgment sustaining the validity of the order, all plaintiffs appeal.

## QUESTIONS

■ *First*: *Did the defendant Insurance Commissioner have the power to promulgate and adopt Ruling 67 changing the method of rating premiums for workmen's compensation insurance?*

*Yes.* Reduced to its bare rudiments, Ruling 67 provides for two new rating systems: (1) the "Retrospective" plans, and (2) a "Premium Discount Plan." Within the general retrospective scheme there are three separate plans, "D," "A" and "B." Thus, we have four plans to consider.

1. *The Retrospective Plans*:

All three retrospective plans have this in common: Final determination of premium cost is delayed, being computed retrospectively *after the expiration of the insurance and on the basis of paid and actual loss experience during the insurance period.* Each insured's premium is determined on an individual basis, without reference to other employers or to particular fields or occupations. (However, in each retrospective plan, a sort of "tentative" premium is paid initially, and then adjusted at the end of the insurance period to the actual premium.)

PLAN D: Plan D provides for retrospective determination of premium for employers who produce $5,000 or more in annual premium from operations in *all states*. Determination may be on an annual or three-year basis. The unique feature of Plan D is that the employer may combine premiums from other lines of liability insurance with his workmen's compensation premium in order to become eligible for this plan. (This multiline provision is not in either Plan A or B.) In brief, Plan D may be chosen if annual premium is over $5,000, based on premiums from all states, including other types of liability insurance. (Test: $5,000 total, multistate, multiline.)

PLAN A: Plan A provides for retrospective determination of premium for employers who produce $1,000 or more in workmen's compensation premium *in all states*. (Workmen's compensation only; not a multiline plan.) The standard (or tentative) premium in Plan A is always the maximum pre-

mium, and the minimum premium is higher than in Plan B. (Test: $1,000 total, multistate, workmen's compensation only.)

PLAN B: Plan B provides for retrospective determination of premium for employers who produce $1,000 or more in workmen's compensation premium *in all states*. (Workmen's compensation only; not a multiline plan.) In this plan, the standard (tentative premium) is lower than the maximum, and the minimum premium is lower, correspondingly, than the minimum premium in Plan A. These maximum-minimum levels are the chief differences between Plans A and B. (Test: $1,000 total, multistate, workmen's compensation only.)

*How retrospective plans work*: Retrospective rating is defined in Appendix B to Ruling 67 as "a plan or method which permits adjustment of the final premium for a Risk on the basis of its own loss experience subject to Maximum and Minimum limits." In tabular plans A and B, the maximum and minimum premiums are fixed in relation to the standard (tentative) premium, which in Plan A is the maximum and in Plan B is much lower. In Plan D, the selection of maximum and minimum limits is left (within limits) to agreement between the buyer and seller. Within the limits of the maximum and minium, Ruling 67 provides formulae reflecting loss experience and costs used in determining the final cost of the insurance. The appropriate formula is applied at the end of the insurance period, and the result is an adjustment of the standard premium to reflect the actual loss and cost experience during the insurance period. This adjustment results in the retrospective rate.

2. *Premium Discount Plan*:

This plan provides for graduated expense loading determined through a *scale of discounts graduated according to the annual amount of the employer's premium*. To qualify for this plan, the employer must have premiums from workmen's compensation in excess of $1,000. This total may include premiums paid in all states to one insurer, but may not include other lines of liability insurance. (Multistate, but not multiline.) Then, the discount is applied to the California portion of the premium. This discount is received no matter how small the California portion may be; that is, the California portion need not be over $1,000. Furthermore, the discount is granted irrespective of loss experience.

"The California portion of the total workmen's compensation standard premium of the policy or group of policies com-

bined in accordance with this Rule shall be subject to the following discounts:

| Total Workmen's Compensation Standard Premium | | Discounts Applicable to California Portion |
|---|---|---|
| First | $ 1,000 | None |
| Next | 4,000 | 7.1% |
| Next | 95,000 | 12.2% |
| Over | 100,000 | 13.7% |

"The foregoing premium discounts shall not be applicable to any standard premium subject to. retrospective rating." (Rule VII (2) Underwriting and Auditing Procedure of the California State Insurance Commissioner.)

In Statutes 1913, chapter 176, a compulsory workmen's compensation system and the State Compensation Insurance Fund were established by the Legislature, without any express constitutional authority therefor. To give legality to an already accomplished fact, article XX, section 21, California Constitution, authorizing the Legislature to "create, and enforce a complete system of workmen's compensation," was adopted in 1918. Pursuant thereto, we now have Insurance Code, sections 11730 to 11742, covering "State Rate Supervision."[1]

By Ruling 67, the commissioner seeks to modify existing minimum workmen's compensation premium rates by putting

---

[1] Important here are the following:

Section 11730: "The term 'merit rating,' as used in this article, includes 'schedule rating,' in which the rate is varied according to physical conditions, and also includes 'experience rating,' in which the experience of the particular insured is used as a factor in raising or lowering his rate."

Section 11732: "The commissioner shall approve or issue, as adequate for all admitted workmen's compensation insurers, a classification of risks and premium rates relating to workmen's compensation insurance. He may also approve or issue a system of merit rating. Such classification and system shall be uniform as to all insurers affected."

Section 11734: "The commissioner may change any such classification or system previously approved or issued if he first holds a hearing to determine the effect of the proposed change upon the adequacy or inadequacy of rates. Such changes shall also be uniform as to all insurers affected."

Section 11737: "If the commissioner approves or issues such a system of merit rating, insurers may apply it to any risks subject thereto, but shall show basis rates no less than the rates under the classification approved or issued by the commissioner. Any reductions from the basis rates on account of the application of such system of merit rating shall be clearly set forth in the insurance contracts or policies or indorsements attached thereto."

Section 11738 gives statutory backing to the participating companies, permitting refunds "from surplus accumulated from premiums. . . ."

into effect two new rating plans, one of them called the "Premium Discount Plan" and the other the "Retrospective Rating Plan."

The purpose of both rating plans is to introduce into the California workmen's compensation insurance minimum rate structure the principle of "expense graduation by size of risk" as a means of reflecting in premium rates the commissioner's finding that an insurance company's expense involved in handling individual risks represents a smaller percentage of the premium in the case of larger risks than in the case of smaller risks.

The present system, under which minimum premium rates are loaded by the commissioner for expense on a flat percentage basis without reference to possible variation of expense by size of risk, involves a redundancy of the expense item in the case of the larger risks. The commissioner has concluded that the proposed modifications of the rating structure will maintain adequate minimum rates and at the same time reduce existing expense redundancy, and, further, that their effect will be to promote competition between all types of workmen's compensation insurance carriers and to reduce rates charged to the public.

The two plans, although similar in purpose, seek to accomplish the purpose in different ways and may be considered separately.

In the case of the Premium Discount Plan, the commissioner seeks to accomplish the purpose by providing that all workmen's compensation policies involving premiums in excess of $1,000, computed at the regular manual rates, shall be subject to a graduated discount in favor of the insured upon the California portion of the premium.

Plaintiffs contend that this Premium Discount Plan exceeds the powers granted to the commissioner by the California Workmen's Compensation Insurance Minimum Rating Law.

Insurance Code, sections 11732 and 11734, provide that the commissioner shall approve or issue as adequate for all admitted insurers a classification of risks and premium rates, uniform as to all insurers affected. The commissioner is not restricted by these sections (as contended by plaintiffs) to a mere grouping of hazard in each with a corresponding rate for each such classification. Rate-making involves a consideration, not only of the particular hazards of various occupations, but also of losses (pure premium) and of expense (expense

loading). This is especially true where, as under our statute, the rate must be adequate. Expense is, therefore, not only a relevant, but an essential factor to be considered.

█ It is true that the commissioner in the past has always reflected this expense factor in the rate by means of a flat percentage loading. But, there is nothing in the statute which, expressly or impliedly, restricts him to that mode of considering and reflecting the expense factor.

█ The commissioner concluded in making up the Premium Discount Plan that a flat percentage expense loading produces redundancy in rates beyond the requirements of adequacy. He may thus make such modification of the flat percentage loading as to him seems necessary to correct the redundancy.

In the Premium Discount Plan, the commissioner has seen fit to do this by the device of providing for a graduated discount from the premium produced by the manual rate. Plaintiffs' argument to the effect that in so doing the commissioner fixes a premium, rather than a premium *rate*, is based upon form rather than substance.

The discount from the manual rate becomes in effect a modifying factor in the rate-making process.

Turning now to the Retrospective Rating Plan, this plan involves different features. Although it applies the principle of expense graduation by size of risk, it does so as part of a plan of merit rating issued under the merit rating provisions of the Insurance Code.

Sections 11732 and 11734 provide that the commissioner may approve or issue a system of merit rating. Insurance Code, section 11730, defines merit rating as including schedule rating ''in which the rate is varied according to physical conditions,'' and experience rating ''in which the experience of the particular insured is used as a factor in raising or lowering his rate.''

█ The Retrospective Rating Plan has been issued as a form of experience rating. Plaintiffs contend, however, that it is not experience rating within the meaning of Insurance Code, section 11730, because under that section, the experience of the particular insured which may be used as a factor in raising or lowering the rate means, according to plaintiffs' interpretation, the *past* experience of the insured, and does not permit use of *current* experience during the policy year as provided in the Retrospective Rating Plan.

The statute, which expressly defines the term "experience rating" without any such restriction, should not be so narrowly construed and the Retrospective Rating Plan is, therefore, a form of experience rating within the power of the commissioner to issue. In this connection it is significant that in 1938, a former commissioner issued a Retrospective Rating Plan based upon the same principle and still in effect except as modified by the present plan, which embodies additional features.

The uniform interpretation prior to and since 1914 of "classification of risks and premium rates" by persons in the business has been risk groupings by occupation, businesses and industries by degree of hazard with a corresponding rate for each classification.

It is claimed that what the Legislature intended by the use of these words was to freeze that method into the act. There is not any such intention in the act. It is obvious that the Legislature had no intention to freeze any particular method of classification because in section 11734 it expressly provided he "may change any such classification or system. . . ." See *First Industrial Loan Co.* v. *Daugherty*, 26 Cal.2d 545, 550 [159 P.2d 921], as to powers of an administrative officer to make changes reasonably necessary to effectuate the purpose of the statute governing him.

It is a general rule of statutory construction that a statute, expressed in general terms and words of present or future tense, will be applied, not only to situations existing and known at the time of the enactment, but also prospectively to things and conditions that come into existence thereafter.

Legislation must be given elastic operation if it is to cope with changing economic and social conditions. (2 Sutherland, Statutory Construction, 3d ed., § 5102, pp. 509-510.)

Over the years of the existence of the Fund, with the knowledge of the insurance trade, the hazard of the particular employment has not been the sole basis of classifying risks and rates. Size limits as to eligibility based on the cost of administering plans and size of the organization have also been considered. For example, minimum payrolls of packing houses and department stores and others have been considered. In 1946 the insurance commissioner approved the principle of graduation of expense by size of risk as applied to premium discount and retrospective rating plans. In 1951 he applied an additional charge on risks earning a premium under a certain amount. This is called "expense constant." While

not determinative, the interpretation of a statute by an officer administering it as a specialist is entitled to "great weight." (See *Whitcomb Hotel, Inc.* v. *California Emp. Com.*, 24 Cal.2d 753, 756 [151 P.2d 233, 155 A.L.R. 405].)

The plans set up by Ruling 67 contemplate rating of premiums for workmen's compensation based upon premiums paid by the California employers in other states, under Plan D for other types of liability insurance as well as workmen's compensation, in the other plans for the latter type insurance only.

It is contended that the commissioner had no power to authorize this "interstate rating," since it was not uniform because plaintiff State Compensation Insurance Fund is permitted by statute to engage only in *intrastate* business, while its competitors may engage in either *intrastate* or *interstate* business.

This contention is untenable. Under Insurance Code sections 11732-11734, the commissioner is not limited in his process of reflecting the expense factor to the consideration of only expense as reflected in California premiums. Even under the flat percentage loading system, the commissioner has always based his findings as to the proper expense loading of a premium upon all available statistical evidence, statewide, nationwide, or both. There is nothing in our statute to prevent similar consideration in working out a premium discount which is merely a modification of the flat percentage loading.

It is also contended that Ruling 67 violates Insurance Code sections 750, 11738 and related statutes which prohibit rebates. Sections 750 and 751 prohibit rebate of the premium "payable on an insurance contract" or "not . . . specified . . . in the policy. . . ." Here the rating plans, if used, would be specified in each policy and provide for discounts, not rebates. A discount is not a rebate or refund but a method of computing rate. (See *Associated Indem. Corp.* v. *Oil Well Drilling Co.*, (Tex.Civ.App.) 258 S.W.2d 523, 532, 153 Tex. 153 [264 S.W.2d 697].)

Section 11738 provides that "A refund by reason of a participating provision in a compensation policy" may only be made from surplus. "Participating" refers to the right to share in earnings and does not refer to the price paid for insurance. Refunds to participants should only come from surplus, although there are other types of refunds which obviously do not have to come from surplus, thus, refund of

unearned premium on cancellation. Premium discount and retrospective rating do not refund anything. They are merely formulae for determining amount of price of insurance ultimately to be paid. The various opinions of the attorney general and counsel for the commissioner dealt with attempts, by guaranteeing dividends, to contract for rates lower than the minimum prescribed by the commissioner. Here the rating plans as applied (including the discounts) constitute the minimum rates.

*Second*: *Did defendant violate procedural requirements?*

*No.* There was not any irregularity or abuse of discretion in the procedure followed by the commissioner.

(a) Outside Evidence.

It is contended that Exhibit 42 relating to retrospective rating only, and containing arithmetical calculations increasing the excess loss premium factor in the rating plans to reflect certain information obtained after the hearing from other files and records in the commissioner's office, was considered by the commissioner without the presence of plaintiffs, and that thereby the hearing contemplated by section 11734 was denied.

The plans included in Ruling 67 are the result of studies that have been made since 1946, at which time a former California commissioner had rejected similar proposals, not upon the ground of any lack of legal power, but solely for the stated reason that there was insufficient statistical data at the time.

Since then, studies were made under the sponsorship of the National Association of Insurance Commissioners to accumulate further statistical data relative to the principle of graduation of expense by size of risk. The results of these studies were the subject of the hearings held by the defendant, California Insurance Commissioner, prior to the issuance of the present Ruling 67.

Among other things there was evidence before the commissioner to the effect that similar plans were in operation and working satisfactorily in other states. He points out that 35 states have a premium discount plan and 45 states have a retrospective rating plan similar to Plan D herein involved.

Plaintiffs further contend that Exhibit 42, which consists of some arithmetical calculations made by the commissioner concerning excess loss premium for purposes of the Retrospective Rating Plan, was not properly a part of the

record. However, the nature and purpose of these calculations were such that their consideration by the commissioner did not constitute an irregularity. Nor could their consideration possibly have prejudiced plaintiffs.

Particularly is this so, because all interested parties were given every opportunity to introduce material for the consideration of the commissioner and the effect of the material in Exhibit 42 was to *increase* the permissible minimum rates. Plaintiffs being in no way prejudiced by the commissioner's action, may not complain. (See *Eastern-Columbia, Inc.* v. *County of Los Angeles,* 61 Cal.App.2d 734 [143 P.2d 992].)

(b) Delegation of Authority.

■ The functions of revising and constructing tabular plans which the commissioner delegated to the Inspection Rating Bureau (a rating organization licensed by the state) were proper in view of the Bureau's functions and relationship to the commissioner as recognized by Insurance Code, sections 11750.1-11758, especially where such rating values would have to be ultimately embodied in a policy or endorsement approved by the commissioner. (Ins. Code, § 11658.)

■ It is further contended that the commissioner improperly delegated authority to the Inspection Rating Bureau by authorizing it to accept verification of certain data from rating organizations in other states or, in lieu thereof, from individual insurance carriers.

This is in conformance with long and necessary practice in similar and related matters (see also Ins. Code, § 731; Ins. Code, § 12921.5) and does not constitute an improper delegation of the commissioner's statutory powers.

(c) Promulgation of Ruling 67.

■ It is claimed that Ruling 67 was never validly promulgated by the commissioner. Government Code, sections 11371, subdivision (b), and 11380, requiring certain administrative regulations to be filed with the Secretary of State, expressly except regulations establishing or fixing rates, prices or tariffs. Both the Premium Discount Plan and the Retrospective Rating Plan are regulations fixing and establishing insurance premium rates within the meaning of this exception. They were promulgated reasonably and in conformity with long-established practice in the insurance industry.

(d) Effective date.

 It is urged that the commissioner abused his discretion in making the effective date of Ruling 67 approximately 11 days after promulgation, in view of the fact that the ruling had to be filed with the Secretary of State (Gov. Code, § 11380) and section 11422, Government Code, provides that a regulation required to be filed with the Secretary of State becomes effective 30 days after such filing.

Section 11736, Insurance Code, states that the effective date of rates issued by the commissioner shall be the date fixed by him. It is not too important which of these sections controls here for the reason that the plans established by Ruling 67 are not compulsory. They are elective and become applicable if the insured and insurer so agree by appropriate provision in the policy contract. No insurer was required to adopt any of these plans on or after either effective date. If an insurer makes no election under Ruling 67, its rates continue under the existing system.

(e) The Ruling was Sufficient, Clear and Complete.

 Plaintiffs make the further claim that Ruling 67, particularly Appendix B, is not sufficiently clear and intelligible. Although the subject matter is admittedly technical and complicated, it is legally sufficient. It must be borne in mind that the material in question is designed not for laymen but for the guidance of insurance specialists.

 Such orders should be upheld if they are susceptible of reasonable interpretation and use in the industry and should not be invalidated by a court merely because their construction may be difficult or because of the possibility of differing interpretations.

 It is further argued that Ruling 67 was incomplete when issued because in it the commissioner gave certain directions to the California Inspection Rating Bureau for the revision of Tabular Plans A and B and for the construction of various tabular plans, all as related to the Retrospective Rating Plan, without need of further specific approval by him. However, such future revision of the commissioner's Tabular Plans A and B would not make Appendix B any less complete as it stood at the time of issuance.

 There is substantial evidence to the effect that the use of the flat percentage expense loading has produced rates that are excessive in the larger premium brackets, a portion of which has been returned by way of dividends. The statute

requires adequate minimum rates. There is nothing in the statute requiring the freezing into the rate structure particular factors merely because they have been used in the past. The rating law which authorizes the commissioner within the limits herein discussed in prescribing fair and equitable minimum rates based on the cost to insurers of furnishing the insurance in nowise prohibits him from recognizing the existing gradation of expense by size of risk without allowing excessive premiums to enable certain insurers to pay high dividends.

 *Third*: *Does Ruling 67 violate the constitutional and statutory policies pertaining to the workmen's compensation system and particularly, the State Compensation Insurance Fund?*

*No.* In 1911 the Legislature enacted the Roseberry Act, which was an elective rather than a compulsory compensation act. (Stats. 1911, chap. 399.) Section 21, article XX, California Constitution, adopted the same year, expressing a basic policy concerning workmen's compensation, did not expressly provide for state compensation insurance.[2]

 Following receipt of the message and the report mentioned in the footnote, the Legislature passed the Boynton Act (Stats. 1913, chap. 176) making workmen's compensation compulsory and creating the State Compensation Insurance Fund. In 1918 the present section 21 of article XX was adopted expressly providing authority for the creation of such fund, which had already been operating since 1913.

Section 11775 of the Insurance Code provides: "The fund

---

[2] In Governor Hiram W. Johnson's First Biennial Message to the Legislature, January 6, 1913, he called attention to "the rapacity of insurance companies" concerning insurance for industrial accidents, and recommended that a state insurance fund be provided. In the First Report of the Industrial Accident Board (created by the Roseberry Act) to Governor Johnson, in recommending that a state compensation fund be provided, it was pointed out that employers were not "electing" the compensation provisions of that act, mainly because of the "adverse rates made against compensation by the liability insurance companies." To make compensation compulsory on all employers and leave them "at the mercy of a combination of insurance companies" whose rates for California were made in New York City, would be an injustice to the employers. Nor, it was felt, would a state monopoly of insurance meet the situation. What was needed was for the state to "invade the sphere of private enterprise only to the extent that is needful in order to obtain justice for its people." It then stated that to be self-supporting a state fund would have to do about 12 per cent of the business, "after which the opportunity of private enterprise to do a prosperous business in that field will be dependent upon its ability to do business more efficiently than the State can do it."

shall, after a reasonable time during which it may establish a business, be fairly competitive with other insurers, and it is the intent of the Legislature that the fund shall ultimately become neither more nor less than self-supporting. For that purpose loss experience and expense shall be ascertained and dividends or credits may be made as provided in this article.'' In view of this constitutional and legislative policy, the commissioner would have no power to adopt a rating system which would violate this policy or prevent the fund from adequately performing its functions.

It is true that the Fund may not be able to participate in the interstate and multiline features of the plan because it has no authority to write insurance outside of the state or in other lines. Theoretically, it can join with multiline and multistate companies. However, as a practical matter it will not be able to do so. It must be remembered that during its entire existence it has not been able to write insurance on an interstate basis, as do many carriers, yet it has never been claimed that the rate structures existing heretofore applying to both the Fund and to intrastate and interstate carriers were invalid, and during all this period the Legislature has not concerned itself with this difference between the power of the Fund and of interstate companies. The competitive advantage of multistate companies, if any such advantage exists, has not injured the Fund to date. While there has been no experience with the competition of multiline companies, the evidence as to whether such competition would seriously affect the Fund is conflicting. The trial court resolved that conflict in favor of the ruling.

It is contended that Ruling 67 will result in the Fund getting only the business of policyholders having less than $1,000 of annual premium, the expense ratio of which business is higher than where the premiums are large, and that this small business, combined with the state agency business,[3] would not be sufficient to permit it to compete with the other carriers. Sixty-eight per cent of all workmen's compensation business in California has been written by the California companies (including the Fund, which writes 24.78 per cent of the business) in competition with companies doing an interstate business. It would appear that the Fund has held its own with both local and multistate companies.

[3] About 10 per cent of the Fund's business is from state, municipal and district agencies which are required by law to insure with the Fund.

The general expense level recognized by the commissioner in Ruling 67 was in excess of 40 per cent (36.55 per cent expense loading plus $10 expense constant for small risks). The expense level of the Fund is less than 14 per cent. This leaves the Fund an average margin of 24 per cent with which to meet the competitive effect of a discount plan which permits discounts ranging from 7.1 per cent to 13.7 per cent as to a portion only of business. State Fund dividends have averaged around 25 per cent of premium in recent years and in the case of some risks dividends up to 70 per cent have been paid. At least four states[4] having state funds have approved these rating plans.

The commissioner determined that the effect of the use of the plans provided by Ruling 67 on "participating" insurance carriers, including the Fund, will be not any injurious interference with their ability to compete for workmen's compensation insurance business but merely the correction of an accidental competitive advantage enjoyed by them up to this time as a result of the continued use in California of the flat percentage loading formula with its inherent rate redundancy. The trier of fact, in effect, came to the same conclusion. Whether, as claimed by plaintiffs, the plans will result in loss by the Fund of most of its business where the annual premiums exceed $1,000 and practically all of its business where the annual premiums exceed $5,000, or will not, as claimed by defendant, and in effect as found by the court, is a matter that can be determined definitely only by application of the plans.

The fact that the McBride-Grunsky Act (Stats. 1947, chap. 805) in setting up a rating mechanism for liability insurance expressly authorized many of the features of the plans included in Ruling 67, but expressly excluded workmen's compensation insurance from the provisions of the act, can in no way be construed to mean that the Legislature intended that those features could not be used by the commissioner in a system of workmen's compensation insurance rating. It merely meant that the Legislature was continuing the historic procedure of completely separating the control and operation of workmen's compensation insurance from that of all other types of insurance.

It apparently is contended that in order to be "fairly competitive with other insurers" the Fund must be in all

[4]Michigan, New York, Maryland and Pennsylvania.

respects in the same situation as its competitors and that because the Fund, by law, is restricted to California workmen's compensation insurance only, it cannot be in the same situation as multistate and multiline insurers. We have pointed out that historically the Fund has more than held its own with the competition of the multistate insurers, and that that competition from the beginning has been considered not to interfere with the Fund being fairly competitive. For the same reason competition with multiline insurers does not in itself interfere therewith.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

Contrary to the holding of the majority, I believe the rating system here involved (Rule 67 of the Insurance Commissioner) violates the clear statutory mandate that any rating system must be uniform.

The statute provides that classification of risks and premium rates "shall *be uniform* as to all insurers affected" (emphasis added; Ins. Code, § 11732) and any "change" in classification or rating system "shall . . . be *uniform* as to all insurers affected." (Emphasis added; *id.*, § 11734.) Also under the law the state Fund must be "fairly competitive with other insurers" and shall be neither more nor less than self-supporting. (*Id.*, § 11775.) It is conceded that the Fund may write only workmen's compensation insurance and that only in connection with operations of an employer in this state; however under both plans as embodied in the commissioner's Rule 67, there is taken into consideration multistate business, that is, business written in states other than California. In one plan, in addition, there is considered multiline business, that is, insurance in other fields such as third party liability insurance. Inasmuch as the Fund cannot engage in those types of business the rule cannot operate uniformly as to it. The basis upon which premiums must be calculated are entirely different. The Fund is not in a position to be fairly competitive. The Fund would be excluded, by the limitations on its powers, from a substantial portion of the workmen's compensation insurance market and hence rates so based are not uniform. Uniformity must mean equality of opportunity. To permit the system of rates and classifications to be based

on business of a character forbidden to the Fund plainly discriminates against the Fund and other insurers not engaged in multistate or multiline insurance business. With such discrimination there can be no uniformity which is required by the statute.

I would therefore reverse the judgment.

Shenk, J., concurred.

Appellants' petition for a rehearing was denied March 28, 1956. Shenk, J., and Carter, J., were of the opinion that the petition should be granted.