[Civ. No. 23353. Second Dist., Div. Three. Mar. 26, 1959.]

ALLSTATE INSURANCE COMPANY (a Corporation), Respondent, v. STATE BOARD OF EQUALIZATION, Appellant.

Edmund G. Brown and Stanley Mosk, Attorneys General, and Harold B. Haas, Deputy Attorney General, for Appellant.

Luckham & Grabow and Paul P. Selvin for Respondent.

VALLÉE, J. — Plaintiff brought this action to recover $9,355.07, comprising additional assessments levied by defendant against plaintiff in 1955. Plaintiff had judgment as prayed, with interest. Defendant appeals.

Plaintiff, an Illinois corporation, since prior to 1951 has been authorized to transact disability, liability, plate glass, common carrier liability, boiler and machinery, burglary, credit, sprinkler, and automobile insurance business within the state, and since January 1954 has also been authorized to transact fire, marine, team and vehicle, and miscellaneous insurance business within the state.

Plaintiff charged a stated premium, payable in advance, for a year of insurance. However, if the insured desired to pay the premium in installments he could do so by paying 40 per cent thereof plus what plaintiff designates as an "installment payment fee" in advance, paying 30 per cent in three months and 30 per cent in six months from the inception date of coverage. Plaintiff paid the tax on the installment payments for the years 1951-1954. It did not pay any tax on the installment payment fees it collected for those years. In 1955 the board levied additional assessments covering the "installment payment fees" collected by plaintiff in the years 1951-1954. Plaintiff paid the additional assessments under protest and brought this suit to recover them.

The amount of the "installment payment fee" was determined by cost accounting and was imposed to cover additional bookkeeping expense, and the collection expense ensuing from the necessity of additional entries in the accounts and billings resulting from the exercise of the installment payment plan. An application for insurance contained a printed box in which the installment fee was set forth. Policies of insurance contained a space in which the "Total

Payment Fee'' is stated and made a part of the payments to the company.[1]

The senior vice president of plaintiff testified: "When the applicant has agreed, let us say, to buy coverages totaling $70 premium, the agent then says, 'And would you give me a check for the entire amount now?' And if the applicant says he cannot, then the agent explains that he can pay that premium on the installment plan for a small additional fee, and if the applicant agrees to that, he then multiplies the $70 by 40%, getting $28, and adds fifty cents [now $.75] thereto, and writes $28.50, as the down payment." Referring to the "installment payment fee," he said: "It is an additional operation that must be performed, and we can cost account that, and that is what we charge to the customer who elects to buy time." At the expiration of a prior policy a notice of premium is sent to the policyholder. The notice quotes the "Annual Premium in Full," the single cash premium, and the company calculates 40 per cent of that amount and adds the installment fee of $.50 to it, showing the total of the two as the amount of the down payment if the customer wishes to use the installment payment plan.

The chief actuary of the department of insurance of California testified that life insurance companies on many policies allow the policyholder an option of either paying the premium annually in advance or on a "fractional" basis such as monthly, quarterly, or semiannually. Such installment premiums are increased in amount over the pro rata proportion of the single annual premium by an additional charge based on a calculation of the additional collection expense and a loss of interest resulting from the installment payments. The additional charge is computed on a percentage basis. Periodic payments are more expensive to the companies. It is the custom and practice of the life insurance companies to report the full

---

[1]This space read:

"PAYMENT SCHEDULE
AMOUNT PAID . . . . . . . . . . . . . . $ ————
TOTAL PAYMENT FEE . . . . . . . . . . . $ ————
TOTAL OF DEFERRED PAYMENTS . . . . . . . $ ————

DUE ON DELIVERY . . . . . . . . . . . . . $ ————''
 Notices of premium due contained this:
"To pay the
ANNUAL PREMIUM in FULL $ ————
or to use the Payment Plan
Your first payment will be $ ————''

amount of these monthly, quarterly, or semiannual premiums, which include the additional charge, for tax purposes. The premium in life insurance includes the actual mortality cost, a loading charge to cover the expense of doing business, and a profit to the company. The actuarial concepts of the chief actuary apply to all fields of insurance covered by the constitutional provision with respect to "gross premiums." (See Mowbray-Blanchard, "Insurance," 4th ed., McGraw-Hill, 344; Michelbacher, "Multiple-line Insurance," McGraw-Hill, 74; Maclean, "Life Insurance," 5th ed., McGraw-Hill, 117.)

The issue is: Are the installment payment fees received by plaintiff part of the "gross premiums" within the meaning of section 14-4/5 of article XIII of the Constitution?

Section 14-4/5 in pertinent part reads: "In the case of an insurer not transacting title insurance in this State, the 'basis of the annual tax' is, in respect to each year, the amount of gross premiums, less return premiums, received in such year by such insurer upon its business done in this State."

█ The constitutional provision applies equally to all insurance companies. (*Bankers Life Co.* v. *Richardson*, 192 Cal. 113, 122 [218 P. 586].) █ It imposes the tax on "gross premiums" from all insurance, whether life, fire, marine, or casualty, with the only exceptions being title insurance, reinsurance, and ocean marine insurance. (*Northwestern Mut. L. Ins. Co.* v. *Roberts*, 177 Cal. 540, 542-543 [171 P. 313].)

█ The determination of whether a particular payment is "premium" is a question of law. █ "Premium" in the law of insurance means the amount paid to the company for insurance. (*State Farm etc. Ins. Co.* v. *Carpenter*, 31 Cal.App. 2d 178, 179-180 [87 P.2d 867].) It has been defined as "the sum which insured is required to pay." (44 C.J.S. 1302, § 340.)

█ The gross premium, or the amount charged in a contract of insurance, ordinarily includes two elements, that is, the net premium and the loading. The loading, or the amount arbitrarily added to the net premium, is intended to cover the expenses of the company. In a stock company it may also be a source of profit; and in a mutual company, a source from which dividends may be paid to the insured. (*Fox* v. *Mutual Benefit Life Insurance Co.*, 8 Cir., 107 F.2d 715, 717. Also see 2 Joyce, Insurance, 2d ed., 2171, § 1083.)

One of the questions in *Bankers Life Co.* v. *Richardson*, 192 Cal. 113 [218 P. 586], was whether assessments collected by the plaintiff, an assessment life company, from its members

under its assessment contracts were included within "gross premiums." The court held such assessments were premiums within the meaning of section 14, now section 14-4/5, of article XIII of the Constitution, stating (p. 121):

"We think it clear, therefore, that the first contention of the appellant must fall, and that the constitutional amendment should be construed as providing that it was a 'gross earnings tax' which the framers of the amendment intended, and which the people levied by the adoption of this amendment. To so hold, of course, implies that all earnings, either by way of premiums or assessments, must be included in the term 'gross premiums received upon its business done in this state.'" (Also see *Western T. Acc. Assn.* v. *Johnson*, 14 Cal. App.2d 306, 309 [58 P.2d 206].)

*Equitable Life etc. Soc.* v. *Johnson*, 53 Cal.App.2d 49 [127 P.2d 95], says it is clear that it was the intent of the constitutional provision to tax all receipts that could reasonably be classified as "premiums." The court held that "gross premiums," as used in the constitutional provision, includes the consideration paid for an annuity. The court stated (p. 59):

" 'The Institute of Actuaries' Text-Book defines Premium as follows: "The sum, whether single or periodical, which is payable in consideration of a benefit, is usually called a premium." This definition does not include the idea that the premium must be sufficient or at least equal to the present value of the benefit, nor indeed does that idea properly enter into the definition of the word. The distinction is all the more important as the actuary in his ordinary work is engaged in finding present values of *sufficient* premiums and thus always has the question of the sufficiency of a premium in view. It is beyond question, however, that a sum of money paid and received in consideration for an insurance, endowment or annuity is a premium, whether it be sufficient or not from an actuarial standpoint. A very simple definition would seem to be: "A premium is the price of an insurance, endowment or annuity." ' "

The agreement before the court in *Industrial Indem. Exch.* v. *State Board of Equalization*, 26 Cal.2d 772 [161 P.2d 222], provided that of "savings" credited to the insured, the management of the company should receive a commission. The insurance company entered the savings in its books as a credit to the insured and deducted the entire amount of that credit from its taxable gross premiums. Instead of paying or allowing the full amount of the credit to the insured, it paid 5 per

cent thereof to its attorney in fact pursuant to the terms of the agreement and paid 95 per cent of the credit to the insured. The court held that the 5 per cent commission to the attorney in fact, even though credited on the books to the insured, was an expense attributable to the insurance, a part of the price of the insurance, and a part of gross premiums subject to taxation.

In *Groves* v. *City of Los Angeles*, 40 Cal.2d 751 [256 P.2d 309], Groves was engaged in the business of soliciting, negotiating, and effecting bail bonds as agent of National Automobile and Casualty Insurance Company. As agent, he could charge for a bail bond any percentage of the face amount not exceeding 10 per cent. He paid 2 per cent of the face amount of the bond, part of which was for a reserve fund to meet losses on bonds, less a certain per cent to Associated, attorney in fact for National with power to appoint agents; and Associated paid 1 per cent of the amount of the bond less its commission to National. Holding that the entire amount paid by one obtaining a bond was premium, the court stated (p. 759):

"Defendants point out (heretofore mentioned) that the receipt given by the plaintiff-agent to the one obtaining the bail bond, mentions only the 1 per cent received by National as the premium, and the rest is for services in arranging for the bond. Also he bears the burden of his expenses in conducting the business and may charge for the bond such percentage as he desires not exceeding 10 per cent. We hold, however, that that does not necessarily establish him as an independent contractor rather than National's agent. We believe also that there is no escape from the conclusion that the full sum received by him from the one desiring the bail bond is the gross premium for the bond. National may act only through agents and plaintiff is its agent. All the business transacted by plaintiff is agency business, the end objective and result of which is to find takers of bail bonds and to furnish bail bonds to applicants therefor, and *the amount charged the applicant for a bond is the premium on that bond.* It is not significant how National, Associated and plaintiff choose to allocate that amount, such as for various services, premiums, etc. That is nothing more than an intramural arrangement for their convenience. The fact remains that whatever plaintiff receives from the customer or client for a bond, he is authorized to obtain it, and does so as agent of National. The question should not turn on whether the amount charged for the bond is broken down to specific items for their

convenience. The situation should be the same as where National paid plaintiff's expenses incurred in writing bonds, because those expenses would be reflected in the gross premium paid—the amount charged the applicant for a bond. Nor is it persuasive that plaintiff-agent does not pay all of the 10 per cent he receives to Associated or National. There is little difference whether he uses it to defray the expenses of conducting the bail bond business and pay himself a commission or whether all of it is paid to National which in turn pays him a commission and meets the expenses. *The essence of the matter is that the amount paid by the insured for the bond is the premium and it has been so recognized by the courts.* [Citations.] And a mere bookkeeping method cannot thwart the law. [Citation.] Defendants seem to think that *State Farm Etc. Ins. Co.* v. *Carpenter, supra,* 31 Cal.App.2d 178 [87 P.2d 867], holding that a membership fee to become a member of an insurance organization is not a part of the premium, and *Mutual Benefit L. Ins. Co.* v. *Richardson, supra,* 192 Cal. 369 [219 P. 1003], holding that the amount of the premium stated in the policy above the cost thereof and declared as a dividend to the insured, was not premium, are opposed to the views here expressed, but those holdings on the facts are not contrary to the principle here stated, because the sums paid were not what was actually given by the insured for his insurance. In the first case above cited the membership fee did not entitle the payor to insurance. It only authorized him to apply for insurance and pay the premium. In the second, the amount paid back to the insured as a dividend meant the premium was that much less. In both the basic theory is that the amount paid by the insured for the insurance is the premium. Here, as the bail agent is the insurer's agent, what he receives from the applicant for the insurance—that is, what the applicant pays for the bail bond is the premium. What the agent receives, in legal effect the insurer receives. The so-called 'fees' received by the bail agent do not result in a reduction of the cost to the insured." (Emphasis ours.) (Also see *United States Fid. & Guar. Co.* v. *State Board of Equalization,* 47 Cal.2d 384 [303 P.2d 1034].)

The facts in *Duel* v. *State Farm Mut. Automobile Ins. Co.,* 240 Wis. 161 [1 N.W.2d 887], were these (1 N.W.2d 891): "Under defendant's plan for writing insurance, each policyholder, upon becoming such, is required to pay a separate membership fee for each general class or kind of automobile insurance which he then or thereafter may purchase. This fee

is considered by defendant to be wholly separate and distinct from the premium charged in connection with the policy purchased. The fee varies with the type of coverage and the territory in which the applicant resides or does business. There is a minimum fee for comprehensive coverage of $2.00 and a maximum fee of $10 for collision coverage. Once a membership is paid for any given coverage it is never required to be paid again, although the insured may later change the cars to which the policy applies or drop and later reinstate his insurance.'' Holding that the membership fee was part of the premium, the court stated (1 N.W.2d 892) :

''It is claimed that the membership fee entitles insured to no insurance; that all insurance protection is in consideration of the separate premium. The fact remains that a person may not become insured without paying the membership fee and that the membership fee defrays expenses customarily allocated to premium in the writing of insurance. We are unable to avoid the conclusion that such an exaction is a splitting of the premium as that term is used in the statutes. . . .

'' [P. 893.] [W]e hold that the premium must include the normal and usual expenses of furnishing insurance protection; that the statute requires that the consideration for the premium shall be insurance protection and not extraneous privileges of the sort here given by the membership fee. Thus, it is not only the statutory purpose to include in the term 'premium' all sums which must be paid before insurance protection is granted and which are exacted to defray the cost of insurance protection, but it is contemplated that in return for this premium insurance protection be given which is susceptible of periodic measurement when the insurance is for a definite term. It cannot have been the statutory intent to permit insurance companies to allocate a portion of the expenses of doing business for some sort of privilege and to designate the rest of the cost of insurance a premium.'' (Also see *Metropolitan Life Ins. Co.* v. *Rouillard*, 92 N.H. 16 [24 A.2d 264]. *Cf. Commissioner of Corp. & T.* v. *Metropolitan Life Ins. Co.*, 327 Mass. 582 [99 N.E.2d 866] ; *Metropolitan Life Ins. Co.* v. *Scheufler* (Mo.), 180 S.W.2d 742.)

*State Farm etc. Ins. Co.* v. *Carpenter*, 31 Cal.App.2d 178 [87 P.2d 867], relied on by plaintiff, is not helpful. In that case membership fees were paid to a mutual company by an applicant for the privilege of applying for insurance, which were not returnable if he was rejected by the insurance company and which did not give him any policy protection in and

of themselves. The court said they were not premiums and were not to be included in the computation of a gross premium tax. The membership fee was not consideration for the insurance. State Farm was distinguished in *Groves* v. *City of Los Angeles, supra,* 40 Cal.2d 751, 761, ''because the sums paid were not what was actually given by the insured for his insurance.''

 The expense of administering the insurance is a component of premium. (*State Comp. Ins. Fund* v. *McConnell,* 46 Cal.2d 330, 338-340 [294 P.2d 440].) Reimbursement of the additional expense resulting from selling the insurance on an installment basis is an essential element of the gross premium. The Insurance Code provides for the inclusion as an essential element of the premium of every aspect of the expense of the company. (Ins. Code, § 1852, subds. (c) (d).) ''Rate-making involves a consideration, not only of the particular hazards of various occupations, but also of losses (pure premium) and of expense (expense loading). This is especially true where, as under our statute, the rate must be adequate. Expense is, therefore, not only a relevant, but an essential factor to be considered.'' (*State Comp. Ins. Fund* v. *McConnell,* 46 Cal.2d 330, 338 [294 P.2d 440].)

 The sole basis for the imposition of the ''installment payment fee'' and the determination of its amount was the expense to the company of the additional installment collections. Plaintiff made the charge of the ''installment payment fee'' directly to the insured in order that the increase of its expense from acceptance of installment premiums be passed directly to the insured. The option to the insured was whether he wanted to pay in installments. If he did, he was required to pay the installment payment charge. The option was not whether he wished to pay the charge but in what form he wished to pay the premium, i.e., cash or installments. The insured paid the fee as part of the cost of the insurance he wanted. The ''installment payment fee'' was an item of expense loading to cover the additional cost of the installment premium plan, and was in the same category as the expense loading in the cash premium. It was ''actually given by the insured for his insurance.'' (*Groves* v. *City of Los Angeles, supra,* 40 Cal.2d 751, 761.) The expense incident to the installment payment plan does not differ in character from other expenses included in premium. The entire cost to the policyholder arising out of the issuance and performance of the contract of insurance constitutes the taxable premium.

There is nothing in the Constitution to indicate the word "gross" is not to be given its usual meaning of "whole; entire; total; without deduction."

We conclude that the "installment payment fee" is a part of the "gross premiums" within the meaning of section 14-4/5 of article XIII of the Constitution.

Reversed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied April 21, 1959, and respondent's petition for a hearing by the Supreme Court was denied May 20, 1959.