[No. B001381. Second Dist., Div. Five. May 30, 1984.]

INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB OF
SOUTHERN CALIFORNIA, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

608

---

---

## COUNSEL

Rhoads & Andrews and Barry S. Andrews for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Herbert A. Levin, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**STEPHENS, J.**—This action arises as a result of a claim of tax deficiencies assessed by the State Board of Equalization of the State of California (hereinafter Board) against the Interinsurance Exchange of the Automobile Club of Southern California (hereinafter Interinsurance Exchange). We must decide whether a $1 service fee charged for the instalment plan option on insurance, which was collected and retained by the Automobile Club of Southern California (hereinafter Automobile Club), as fiscal agent for the Interinsurance Exchange, is taxable to the Interinsurance Exchange as a part of its "gross premiums." The facts as stipulated by both parties are as follows:

On October 28, 1975, the Board proposed a deficiency in gross premium taxes against the Interinsurance Exchange for the year 1970, in the amount of $33,384.72, upon its determination that "service fees [of $1,420,626.18] are considered to be taxable gross premiums." On November 25, 1975, the Interinsurance Exchange filed a petition for redetermination with the Board. By notice dated March 22, 1976, the Board proposed further deficiencies in gross premium taxes against the Interinsurance Exchange for the years 1971 through 1974 based upon the same rationale.[1]

On or about April 5, 1976, the Interinsurance Exchange filed a petition for redetermination with respect to the years 1971 through 1974, also incorporating by reference the petition filed November 25, 1975. On September 22, 1976, a hearing was held before said Board in Sacramento, California, at which time the Interinsurance Exchange was allowed to file a brief. Furthermore, counsel for the California Insurance Commissioner was requested to explain to the Board the delay in time in asserting the proposed tax deficiency. On February 28, 1977, the Interinsurance Exchange received a copy of the memorandum by Edward J. Germann, deputy insurance commissioner, as requested by the Board.

By two notices dated January 11, 1978, the Board notified the Interinsurance Exchange that its petition for redetermination had been denied and determined deficiency assessments and interest for the years 1970 through 1974 in the amount of $253,869.12.[2] On or about January 20, 1978, the Interinsurance Exchange paid this amount in full to the state Controller. On April 17, 1978, the Interinsurance Exchange filed for a full refund which

---

[1]The Board determined that the Interinsurance Exchange had collected over $6 million in service fees, and therefore taxes should be remitted in the amount of $146,481.43.

[2]Upon a breakdown, the totals were $179,866.15 for gross premiums tax, and $74,002.95 for interest accrued from the period of 1971 through February 1, 1978.

was subsequently denied in full. On April 21, 1978, the Interinsurance Exchange filed for a refund for the 1975 assessed deficiencies in the amount of $49,106.22, which was also denied in full. At trial, the superior court found for the State Board of Equalization. We affirm.

DISCUSSION

Taxation upon insurance companies is imposed by the California Constitution, article XIII, section 28, which has determined that the "basis of the annual tax" is measured by "the amount of gross premiums, less return premiums, received in such year by such insurer . . . ." Article XIII, section 28 of the California Constitution provides the format and basis for the taxation of insurance companies. Subdivision (a) defines "insurer" and includes insurance companies or associations and interinsurance exchanges. Subdivision (b) states that there shall be an annual tax imposed on the insurer, whereby subdivision (c) defines the basis of that annual tax as "the amount of gross premiums, less return premiums, received in such year by such insurer . . . ."

Insurance Code section 1530 defines the term "gross premium" as including "all sums paid by subscribers in this state by reason of the insurance exchange, whether termed premium deposit, membership fee, or otherwise . . . ."

Finally, Revenue and Taxation Code section 12202 states that "The rate of tax to be applied to the basis of the annual tax in respect to each year is 2.35 percent . . . ."

■  Appellant initially contends that to classify something as a "gross premium," the court must first find that the sums paid were "by reason of the insurance exchange." It asserts that the Interinsurance Exchange must require the payment and because the Automobile Club offered the instalment plan as a distinct part of its own services, and retained the fee, the $1 fee cannot be classified as a part of the "insurance exchange."

The Automobile Club is a nonstock, nonprofit corporation organized as a motor club. Its principal services include emergency road assistance, travel agency services, the handling of certain traffic citations for members, motor vehicle registration assistance, and the preparation and distribution of maps, inter alia, for the benefit of its members. Although the Automobile Club is a nonprofit organization, it pays California franchise tax and federal income tax.

The Interinsurance Exchange, on the other hand, is a legal entity separate from the Automobile Club. Since 1912, it has acted as a reciprocal insurer, organized under the California Insurance Code. Its principal service is to offer a means through which members of the Automobile Club may obtain automobile, boat and liability insurance. As an insurance company, the Interinsurance Exchange is subject to California gross premiums tax.

While it is unequivocally clear that the Interinsurance Exchange and the Automobile Club are separate and distinct entities, there exists a definite relationship between them. Within the bounds of this relationship is the Automobile Club's authority as agent to provide insurance for its members through the Interinsurance Exchange. Without the existence of such a relationship, no insurance could be provided for the Automobile Club's members (absent other insurers). As a part of this relationship, the Automobile Club collects premiums for the return of insurance coverage. In addition, the Automobile Club retains a $1 service fee for those members who elect the instalment plan, to cover the additional costs of the instalment plan insurance coverage. These service fees are unequivocably part and parcel to "all sums paid . . . by reason of the insurance exchange." (Ins. Code, § 1530.) They are being specifically paid by reason of the insurance exchange, whereby the instalment plan is simply an alternative method of obtaining the insurance exchange.

In *Allstate Ins. Co.* v. *State Board of Equal.* (1959) 169 Cal.App.2d 165, 168 [336 P.2d 961], the court addressed the issue of whether service fees charged an insured for the option of the instalment payment plan were properly classified as "gross premiums." In holding that it was properly classified as such, the court said: "[T]he option to the insured was whether he wanted to pay in installments. If he did, he was required to pay the instalment payment charge. The option was not whether he wished to pay the charge but in what form he wished to pay the premium, i.e., cash or instalments. The insured paid the fee as part of the cost of the insurance he wanted. . . . *The expense incident to the instalment payment plan does not differ in character from other expenses included in premium.*" (Italics added.) (*Id.,* at p. 173.)

This same rationale was earlier supported in *Groves* v. *City of Los Angeles* (1953) 40 Cal.2d 751 [256 P.2d 309]. There, Groves and another, doing business as Associated Bond and Insurance Agency (Associated), were soliciting and effecting bail bonds as agent of National Automobile and Casualty Insurance Company (National). As agent, he was able to charge a percentage on the face amount of the bail bond. He paid various parts of the percentage he retained to Associated, which also acted as attorney in

fact for National. Associated paid 1 percent of the amount of the bond less its commission to National. In holding that the entire amount paid by one obtaining a bond was premium, the court stated:

"[W]e believe . . . that there is no escape from the conclusion that the full sum received by him [agent] from the one desiring the bail bond is the gross premium for the bond. National may act only through agents and plaintiff is its agent. All the business transacted by plaintiff is agency business, the end objective and result of which is to find takers of bail bonds and to furnish bail bonds to applicants therefor, and *the amount charged the applicant for a bond is the premium on that bond.*" (Italics added.) (*Id.*, at p. 760.)

Finally, in *Ind. Indem. Exch.* v. *State Bd. Equalization* (1945) 26 Cal.2d 772 [161 P.2d 222], the issue was whether a portion of the premiums received by the insurer (5 percent), which was being paid to the attorney in fact for rendition of services, should be considered a part of the savings returned to subscribers and/or credited to their accounts as savings used in section 1530, and therefore an exemption, not to be included in the gross premiums tax. In deciding this question, the court noted ". . . we should consider whether or not this item made up a part of the cost of the insurance or was really not a part of the sums paid by reason of insurance exchanged." (*Id.*, at p. 775.) In holding that the sums paid to the attorney for his compensation of services rendered were properly included within the classification of gross premiums, it noted "[t]hat was a part of the cost of its participation in a reciprocal insurance arrangement as much as any other item of expense." (*Id.*, at p. 776.)

In asserting extra support for Interinsurance Exchange's position that the service fees in question were not paid by the insureds for their insurance, we are cited to *State Farm etc. Ins. Co.* v. *Carpenter* (1939) 31 Cal.App.2d 178 [87 P.2d 867]. However, there is no basis for support of his position in *State Farm.* There the issue was whether membership fees paid by insureds to a mutual insurer were to be included within the "gross premiums" tax base. The court emphatically held that ". . . the membership fees are no part of the consideration for the insurance, and hence are not to be included in the specification of 'gross premiums' as contemplated by section 14 of article XIII of the Constitution." (*Id.*, at pp. 180-181.)

We therefore hold that the instalment service fees paid by the subscriber are properly classified as a part of the "gross premiums" and can be characterized as a fee paid "by reason of the insurance exchange."

Interinsurance Exchange's second contention is that the "gross premiums" tax can only be applied to those "gross premiums" "received" by the insurer. Having concluded that the instalment fees were properly classified as "gross premiums," we must now determine whether these "gross premiums" were "received" within the contemplation of the statute.

Interinsurance Exchange asserts that in no instance did the fees received by the Automobile Club reach the Interinsurance Exchange. It argues that the fees were at all times retained by the Automobile Club and put into its separate account. Therefore, it insists, the fees were never received. We disagree.

It is established in California case law that in order for a sum to be "received" by an insurer, it need not be actually conferred upon the insurer. As noted by our Supreme Court in *Groves* v. *City of Los Angeles, supra,* 40 Cal.2d at page 761, ". . . as the bail agent is the insurer's agent, what he receives from the applicant for the insurance—that is, what the applicant pays for the bail bond is the premium. What the agent receives, in legal effect the insurer receives."

Similarly, in *Metropolitan Life Ins. Co.* v. *State Bd. of Equalization* (1982) 32 Cal.3d 649 [186 Cal.Rptr. 578, 652 P.2d 426], the Supreme Court had to decide whether certain amounts, though never formally paid to Metropolitan, nevertheless were to be included within the gross premiums measure of the tax imposed on its business done in California. In *Metropolitan,* an arrangement was derived whereby the employer would retain a majority of those funds and pay claims to the employees up to a certain "trigger point," rather than have employers pay a bulk sum to Metropolitan for employee group medical benefit plans. This, in effect, reduced by 90 percent the gross premiums received by Metropolitan. After the "trigger point" had been paid by the employer out of those retained funds, the excess liability payments were to be covered by Metropolitan.

In its analysis, the court took several steps in order to reach its conclusion that because the employer was a mere agent of Metropolitan, the sum total of both the pretrigger-point claims and the amount paid to Metropolitan was to compose the gross premium for tax purposes.

First, the court reasoned that although the funds were retained by the employer, they still went towards the insurance. As a result, the funds were disbursed "in a manner inuring to the economic benefit of Metropolitan." (*Id.,* at p. 661.) Second, the "gross premium" consists of two elements, the net premium and the loading. (*Id.,* at p. 660; see *Mercury Casualty Co.*

v. *State Bd. of Equalization* (1983) 141 Cal.App.3d 43, 47 [190 Cal.Rptr. 72].) The net premium consisted of the employer-paid pretrigger-point claims. The loading consisted of the sum paid by the employer to Metropolitan. As such, the retained funds still economically benefitted Metropolitan.

■ Finally, in accordance with the rationale of *Groves, supra,* and *Allstate, supra,* they derived "the general rule that the insurer is to be assessed a tax based on the total cost of the insurance coverage provided to the insured." (*Metropolitan Life Ins. Co.* v. *State Bd. of Equalization, supra,* 32 Cal.3d at p. 660.)

■ Applying these cases to the instant action, we realize that although the Interinsurance Exchange did not materially receive the service fees, they did, however, receive an economic benefit from those fees collected by the Automobile Club. One could reasonably assume that had the Automobile Club never offered the instalment plan along with its service fee, the number of individuals for whom they write coverage would have been significantly reduced. Also, judging by the amount of fees collected by the Automobile Club in one year on service fees alone, the significance of this plan was astronomical. Also, the service fee here can be undoubtedly classified as a part of "the loading." As such, it is a part of the "gross premiums" and taxable to the insurer.

Despite the conclusions of *Groves* and *Metropolitan,* the Interinsurance Exchange emphatically contends that the scope of the agency relationship must be strictly construed in accordance with the grant of power. The pertinent language of the agreement between the Interinsurance Exchange and the Automobile Club is as follows: "[I]t is hereby agreed between the parties that the Automobile Club of Southern California is hereby appointed as fiscal agent for the Interinsurance Exchange of the Automobile Club; that as such agent the Automobile Club shall have authority to send statements to assureds for premiums due on policies written by the Exchange. *The Automobile Club shall collect said premiums* and may deposit same in banks . . . ." (Italics added.) In light of this language, appellant contends that the scope of the agency is limited to the collection of premiums and not for the collection of service fees. We disagree.

As stated in 1 Witkin, Summary of California Law (8th ed. 1973) Agency and Employment, section 29, page 662, "[t]he terms of a formal written contract between the parties may give some indication of the nature of their relationship. [Citation.] . . . But contractual terms are not conclusive on the issue." Here, the language "collect said premiums" cannot be read as re-

strictively as appellant would see appropriate. Applying the laws of agency, the collection of service fees for installment payment plans could clearly fit within the agent's implied authority.

As stated in Restatement Second, Agency, section 43, at page 133, "[a]cquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance." Interinsurance Exchange cannot now, because of the tax ramifications, assert the alleged limitations of the agent's authority. As the stipulation of facts indicated, this arrangement had been ongoing since 1947. We therefore conclude that the service fees on the instalment plan have been "received" within the definition of article XIII, section 28 of the California Constitution.

■ Finally, Interinsurance Exchange contends that the doctrine of equitable estoppel bars the State Board of Equalization from collecting the deficiency at issue. ■ Application of the doctrine of equitable estoppel requires the existence of four essential elements. Initially, the party to be estopped must be apprised of the facts; he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; the other party must be ignorant of the true state of facts; and he must rely upon the conduct to his injury. (*Evans* v. *City of Los Angeles* (1983) 145 Cal.App.3d 142, 148 [193 Cal.Rptr. 282]; *Fullerton Union High School Dist.* v. *Riles* (1983) 139 Cal.App.3d 369, 378 [188 Cal.Rptr. 897].) ■ Further, estoppel, when applied to estop the government in tax matters, is available only in the "unusual case" in which justification is "'clear and the injustice great.'" (*Illinois Com. Men's Assn.* v. *State Bd. of Equalization* (1983) 34 Cal.3d 839, 855 [196 Cal.Rptr. 198, 671 P.2d 349], citing *U.S. Fid. & Guar. Co.* v. *State Bd. of Equal.* (1956) 47 Cal.2d 384 [303 P.2d 1034].) "The failure to collect the tax authorized by a statute is insufficient to justify estoppel, even if the taxpayer relies on an erroneous construction of a statute by an official." (*Ibid.*)

■ Interinsurance Exchange asserts that because the state of affairs existed as it did for many years without disapproval or taxation by the State Board of Equalization, this justified its belief that the gross premiums tax was inapplicable to the service fees. For the following reason, the doctrine of equitable estoppel cannot be used to avoid liability.

As stated in *U.S. Fid. & Guar. Co.* v. *State Bd. of Equal.*, *supra*, 47 Cal.2d 384, there must be a clear representation that the tax would not

apply. There was no such representation made in the present case. As was stated in a memorandum by Edward J. Germann to the Honorable William M. Bennett, Chairman of the State Board of Equalization, dated February 25, 1977: "The reason for not earlier proposing a deficiency assessment . . . seems to have been basically a feeling . . . of doubt or uncertainty . . . until 1974 when an effort was made by the undersigned to bring the issue to a head for a decision." When considering this memorandum with a letter *dated August 25, 1972,* from Richard D. Barger, Insurance Commissioner, to the Exchange,[3] it is clear that there was no "clear representation" of nontaxability ever asserted upon which Interinsurance Exchange could have justifiably relied.

The judgment is affirmed.

Feinerman, P. J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 25, 1984.

---

[3]That letter reads as follows: "Our review of the tax case law leads us to the conclusion that such charges are taxable as premium in the light of two principal cases (*Allstate* vs. *State Board of Equalization,* 336 P.2d 961 (1959) and *Industrial Indemnity* vs. *State Board of Equalization,* 161 P.2d 222 (1945))."