733 P.2d 710

## TOIVO POTTALA LOGGING, INC., Toivo Pottala and Ruth Pottala, husband and wife, Plaintiff-Appellants-Cross Respondents,

v.

## BOISE CASCADE CORPORATION, Defendant-Respondent-Cross Appellant.

No. 16072.

Supreme Court of Idaho.

Feb. 12, 1987.

Rehearing Denied March 30, 1987.

Charles F. Bean, Coeur d'Alene, for plaintiffs-appellants-cross-respondents.

Guy G. Hurlbutt (argued), and Sandra L. Berenter, Boise, for defendant-respondent-cross-appellant.

HUNTLEY, Justice.

In July 1976, Boise Cascade entered into a contract with the State of Idaho to purchase five units of timber in Valley County in the Kennally Creek area. Under the contract, Boise Cascade was obligated to cut all designated logs, but it only had to pay for those logs which were delivered to the mill; Boise Cascade was not charged for those logs which were cut and left in the woods. Before selling the timber in the Kennally Creek area to Boise Cascade, the State conducted a timber "cruise," which is an inspection of the property with reference to the potential timber yield. The State's timber "cruise" was made available to Boise Cascade, and it revealed that red rot was present in the Kennally Creek area.

Because Boise Cascade's saw mill in Valley County had filled its requirement for lodgepole pine, Boise Cascade sold the timber from the Kennally Creek sale to Wickes Forest Industries. Boise Cascade and Wickes agreed that Wickes would pay only for the merchantable timber actually delivered.

In June 1979, Toivo Pottala Logging, Inc. (Pottala) was contacted by Boise Cascade and was asked to log the lodgepole pine at Kennally Creek and deliver it to Wickes mill. Pottala was told that there were 3.3 million board feet of lodgepole pine to be harvested.

In July 1979, Pottala and Boise Cascade entered into an agreement whereby Boise Cascade assigned the contract to harvest 3.3 million board feet of lodgepole to Pottala. He would be paid $18.11 a ton. In addition, Pottala was to cut the trees, skid them tree length to the landing, where they were to be trimmed and cut to designated lengths. After this process was completed, Pottala was to haul the logs to the mill.

Clauses (2) and (4) of the Boise Cascade/Pottala contract provided:

(2) Contractor will cut and log all designated merchantable timber in the contract area, herein called "covered timber", in a continuous, diligent and workman-like manner and in accordance with the terms and provisions of the Kennally Creek state timber sale contract, herein called "Timber Sale Contract," and deliver covered timber in accordance with the terms and conditions hereinafter contained, at its own costs and expense as follows: 3300M at the rate of 1000M (000) board feet per month, subject to company's right to adjust the rate of

delivery as market conditions at company delivery points and other factors necessitate. . . .

(4) Company shall pay contractor on or about the one and fifteen days of each month, the agreed compensation for all covered timber delivered and scaled for the prior period as follows:

Rate of payment: $18.11 per ton—total logging price—included HAUL LOGS delivered to the Wickes Corporation log yard.

After Pottala began logging, it became evident that one out of three trees was extensively infected by red rot, which is a wood decay caused by various pore fungi. Boise Cascade would not permit the infected timber to be hauled to the mill for scaling and payment if the defect constituted more than sixty-six and two-thirds percent. Therefore, Boise Cascade refused to pay Pottala for a substantial portion of the trees which he had cut, skidded, trimmed, and skidded to the landing. In October 1979, a memorandum agreement was executed between the parties to increase Pottala's payment for logging from $18.11 a ton to $20.08 a ton because of the extensive red rot. Despite this increase, Pottala's gross revenue was reduced by 39.4%. Although Pottala logged all the trees which Boise Cascade had designated, Pottala was paid for less than two-thirds of the lumber he cut. Pottala asserts that Boise Cascade was aware of the amount of red rot in Kennally Creek's timber units, but failed to disclose this information to him.

In July 1982, Pottala filed a complaint alleging that he had logged over 3.3 million board feet, but he had only been paid for 1.85 million board feet. He further alleged that Boise Cascade's failure to pay for the full 3.3 million board feet was a violation of I.C. § 38–1202(c). In January of 1984, Pottala filed an amended complaint which added an action for fraud and tortious violation of an implied covenant of good faith and fair dealing.

Boise Cascade's motion for summary judgment on the interpretation of I.C. § 38–1202(c) was granted. Boise Cascade's motion for summary judgment on the ground that the statute of limitations had run on the new cause of action in the amended complaint was denied. A jury trial was held and a verdict was rendered in favor of Boise Cascade. Both parties appeal.

■ The major issue presented for resolution is whether Boise Cascade failed to comply with the guidelines of I.C. § 38–1202(c), which provides a forest products measurement system for the purpose of determining proper compensation:

**38–1202. Definitions.**—As used in this act, unless the context or subject matter requires otherwise:

. . . .

(c) Forest Products Measurement. For the purpose of payment for logging or hauling logged forest products only, forest products shall be measured by gross weight, or by gross volume converted to gross decimal "C". Measurement may be determined by a sampling process.

Pottala argues that I.C. § 38–1202(c) prohibits a merchantability standard from being imposed upon products where the contract provides that payment shall be calculated on a gross weight scale.

The legislative history provides a foundation for understanding the legislature's intent in enacting I.C. § 38–1202(c). Prior to the enactment of I.C. § 38–1202(c), loggers had complained to the state legislature that saw mill owners were scaling delivered logs unfairly. Therefore, in 1978 the Idaho legislature considered a bill which would require payment on the basis of gross weight; i.e., Senate Bill No. 1543. Although that bill failed, the legislature established a special committee to review log scaling statutes and practices.

The special committee found that use of the Scribner Decimal C Scale did not accurately calculate the board footage of the logs measured by that scale. Further, the committee found that the Scribner Decimal C Scale required a significant amount of human judgment to the point that it did not consistently reflect the board footage.

Therefore, the committee recommended that a gross weight scaling method be adopted. Acting upon that recommendation, Senate Bill 1108 was introduced to amend the log scaling law to a gross weight or gross volume system of measurement. The bill was passed and signed into law as I.C. § 38–1202(c).

Therefore, it is evident that the Idaho legislature sought to guarantee that loggers were paid more fairly for the logs hauled and delivered for scaling. The legislature did not, however, specifically provide that loggers should be free to deliver all logs, brush, forest growth, and timber in all forms (defective or not) and be paid for the weight of such products. Further, the legislation did not specifically prohibit the logger and the purchaser of timber from negotiating a standard of merchantability.

By amending the log scaling law, the legislature merely substituted a faulty system of measurement by replacing it with a verifiable method of measurement. This the legislature accomplished by altering the system of measurement to a gross scale, but the legislature did not address the question of merchantability and contracting for merchantability.

The Court is aware of the injustices which may arise when the logger is required to cut and skid logs that he will not be paid for because of disease or damage. The legislature enabled the logger to be paid for more of his work by amending the log scaling law to a gross weight measurement system. If there is to be additional law providing more adequate compensation for the logger's labor, it must come from the legislature. This Court cannot interpret I.C. § 38–1202(c) as enabling loggers to disregard merchantability standards contracted for with the mill owner. Therefore, the contract entered into by Pottala and Boise Cascade is not contrary to the language of I.C. § 38–1202(c).

■ Pottala also contends that the court erred when it failed to submit to the jury the plaintiff's instructions dealing with fraud, negligent misrepresentation, con-structive fraud and contractual obligations of good faith and fair dealing. We have examined the instruction and conclude the trial court accurately instructed the jury on the law relating to these issues. If when viewed as a whole, the trial court's instructions correctly state the issues and the law, there is no error. *In Garrett v. Nobles,* 102 Idaho 369, 374, 630 P.2d 656, 671 (1981), this Court stated that "[w]here ... the substance of a party's proposed instructions are adequately covered elsewhere, the trial court does not err in refusing the proposed instruction." See *Quincy v. Joint School Dist. No. 41, Etc.,* 102 Idaho 764, 640 P.2d 304 (1981). In addition, this Court stated in *Mann v. Gonzales,* 100 Idaho 769, 771, 605 P.2d 947, 950 (1980) that "[t]he substance of that proposed instruction was adequately covered elsewhere and, hence, the trial court did not err in refusing to give appellant's proposed instruction." The instructions given in the instant action, when read as a whole, correctly state the issues and the relevant law. *Garrett v. Nobles,* 102 Idaho 369, 630 P.2d 656 (1981); *Mann v. Gonzales,* 100 Idaho 769, 605 P.2d 947 (1980).

In that we have disposed of the major issues in favor of Boise Cascade, this Court need not reach the issue of whether the trial court erred in denying defendant's motion to dismiss the causes of action of fraud and negligence as being time-barred.

Costs to respondent. No attorney fees on appeal.

SHEPARD, C.J., and DONALDSON and BAKES, JJ., concur.

BISTLINE, Justice, dissenting.

## I. PROLOGUE

Freedom to contract is an important and integral part of American industry and commerce. At one time in Idaho, the freedom was so unfettered that a borrower of money could agree to repay it with interest thereon computed at 50 percent per month—or any amount which his circum-

stances dictated that he agree to pay in order to obtain the loan.

At one time in Idaho that freedom was such that a man could agree to work for another for a dollar per day, or even an amount less than that.

At one time in Idaho, a rancher or farmer having timber on his property could log it himself and haul it to the mill and sell it for whatever the mill owner might pay him for it. There was as much bargaining power existing on the side of the seller of farmer logs as circumstances commanded—circumstances being the state of the market, and the availability and proximity of other mills. It was a buyer's market, and the mill owner who paid a fair scale, and paid it promptly, would be the mill owner who would be the first to get the sawlogs, if readily available. Mill owners, as with money lenders, and as with employers, were in the saddle and did not have to bargain one bit on what they would pay. Fortunately, many of the mill owners were small entrepreneurs, family enterprises, as it were, and interested primarily in making a fair return on their investments. It was long ago that there was such an over-abundance of freedom of bargaining.

In the year 1879, the Territorial Legislature enacted into law the first provision governing the right to contract for the use of money. Section 5 of the Act provided a maximum charge:

> SEC. 5. Parties may agree in writing for the payment of any rate of interest on money due or to become due on any contract not to exceed the sum of one and one-half per cent. per month; any judgment rendered on such contract shall bear interest at the rate of ten per cent. per annum until satisfied. Tenth Territorial Legislative Session, p. 8.

Section 6 of that Act prohibited the charging of compound interest. Section 7 created in the borrower a cause of action to recover from the lender "treble the amount of money so paid or value delivered above the rate aforesaid...."

In 1955 the bargaining as to wages to be paid became a matter of government concern, and Idaho's first minimum wage was passed. As of the last legislative amendment, the minimum has been set at $2.30 per hour. That low level has prevailed for the past ten years. I.C. § 44–1502. As of 1981 the minimum federal wage allowable under Fair Labor Standards Act was somewhat higher, $3.35, 48 Am.Jur.2d *Minimum Wages* § 2220.

It is much to be doubted that one would contend that parties bargaining toward a contract cannot ignore, but must be bound by, statutory law which specifically applies to the subject matter involved.

In the instant case our concern is not with an overcharge for money lent, nor do we have any minimum wage question—only to note that as with most logging contractors, Pottala probably was paying his crews far above the minimum amounts required by state and/or federal laws. Our concern is with the 1969 (as amended in 1970, 1972, and 1979) remedial legislation known as the Log Scaling Act, and its effect, if any, upon the three-cornered transaction now before us. Justice Huntley, in writing the majority opinion, has provided a synopsized history of the legislation, its purposes, and what he believes the legislation did accomplish, and also what he believes it does not accomplish. He reaches the conclusion that the legislature only "sought to guarantee that loggers were paid more fairly for the logs hauled and *delivered*...." In my view, the legislative *intent* was that the loggers be fairly paid for their labor in logging, also including the far less burdensome and less dangerous trucking of the logs to a designated mill, whether the logs went into lumber and/or timbers, or other forest products (one of which mentioned in the state contract in this instance was wood pulp) would be of little moment to the logger and his crew. The central purpose of the state's contract was "waste not-want not" and that philosophy was embodied in the contract. Our concern today is more with the net compensation a logger should receive. I am impressed with the views of Attorney General Leroy as expressed in

Attorney General Opinion No. 80–10, pertinent provisions of which are:

QUESTIONS PRESENTED:

1. In § 38–1202(C), as amended, does the gross measurement of forest products allow for any deduction for defect (net scale)?

2. Must a mill pay by gross measurement for cull logs delivered to the point of scaling?

....

CONCLUSIONS:

1. The amended scaling law requires payment for logging and hauling agreements by gross scale, which means without deduction for defect as in net scale.

2. Since a cull is determined by net scale and a cull log is a "forest product," the amended law requires mill owners to pay for culls by gross scale. merchantability standards and bonuses and penalties are contractual, unless based upon a reduction in gross scale.

....

INTRODUCTION:

The 1979 Legislature amended Chapter 12, Title 38, *Idaho Code*, concerning log scaling. The legislation was an attempt to resolve dissatisfaction by loggers and haulers who contended that they were not being paid fairly for logs hauled and delivered for scaling. Loggers argued that they were not paid for culls and were particularly concerned about "borderline culls." Culls for logs which contain a high percentage of defect determined by net scaling procedures. Prior to the 1979 amendments, payment for logged forest products delivered for scaling was generally by net scale. Logs determined by net scale to be culls were discarded and not paid for. Loggers complained that the net scale, or the determination of the amount of defect in a log, was an unreliable "human" factor, often resulting in disagreement over "borderline culls."

Mill owners, on the other hand, contended that they could only pay for usable material. Results of mill studies performed over the years by the U.S. Forest Service and others have shown that logs which fall below merchantability standards, usually at least 33⅓% sound, are not economical to process. The mill owner cannot afford to process such culls. Moreover, culls are often not usable and if processed through the mill can damage the mill's system. Mill owners claimed it was not their responsibility to keep culls from being hauled and delivered for scaling.

Consequently, the law was amended to require:

For the purpose of payment for logging or hauling logged forest products only, forest products shall be measured by gross weight or by gross volume converted to gross decimal "C." *Idaho Code*, § 38–1202(c).

ANALYSIS:

1. ANSWER TO QUESTION ONE: § 38–1202(c) now requires that logged forest products be scaled by gross measurement. The use of the word "shall" denotes a mandatory intent. The definition of "gross," "net scale," and "gross scale" will resolve the question:

"Gross" is defined as follows:

Before or without diminution or deduction (citations omitted); whole; entire; total; as the gross sum, amount, weight—opposed to net (citations omitted). *Black's Law Dictionary*, "Gross," p. 832; *Allstate Ins. Co. v. State Bd. of Equalization*, 169 Cal. App.2d 165, 336 P.2d 961.

"Net scale" is defined as follows:

Measurement of log content with deduction for defects. *Terminology of Forest Science, Technology, Practice & Products* (hereinafter F.S.T. & P.), Society of American Foresters, Washington, D.C., 1971, p. 177.

"Gross scale" is defined under an expressed synonym, "Full scale" as:

Measurement of log content in log scale board feet, without deduction for defects. F.S.T. & P., p. 114. [Emphasis added.]

These definitions demonstrate that "gross" and "net" are incompatible and opposite terms. Gross scale means a measurement without deduction for defect. The amended scaling law thus allows no deduction for defects.

2. ANSWER TO QUESTION TWO: Again, definitions will be dispositive of the question. "Forest products" means: "Any raw material yielded by a forest." F.S.T. & P., p. 109. In a related statute, the Idaho Legislature has partially defined "forest products":

It shall be unlawful and constitute a misdemeanor for any person, firm, company, or business to transport on the public highways of this state any load of forest products, including coniferous trees, Christmas trees, sawlogs, poles, cedar products, pulp logs, fuelwood, etc., without proof of ownership.... I.C. § 18–4628(a).

Subsection (b) excludes wood chips, sawdust and bark, suggesting that they would otherwise be included in the term "forest products." It is apparent that "forest products" in its ordinary meaning refers to all products derived from trees including but not limited to sawlogs, veneer, poles, cedar products, pulp logs, fence posts, and others. The law does not make any exceptions for particular forest products.

To determine whether a cull is a forest product as that term has been defined above, the definitions of "cull and "defect" are helpful. "Cull" refers to:

1. Any item of production, e.g., trees, logs, lumber, picked out for relegation or rejection because it does not meet certain specifications, e.g., as regards usable or on-grade content.

2. The deduction made for gross timber volume to adjust for defect. F.S.T. & P., p. 65.

"Defect" includes:

In timber, any feature (whether intrinsic, e.g. Knots, or developing later, e.g. decay, splits, bad sawing) that lowers its utility and/or commercial value and may therefore lead to relegation as a cull. F.S.T. & P., p. 72.

*Industry practices indicate* that logs which are culls for some purpose such as for saw logs are usable under varying circumstances for other purposes including pulp logs and a variety of cedar products such as shakes, rails, and pickets. Depending upon the market at a given time, a mill may not use cull logs. One mill might use culls more often than another mill.

Moreover, *the legislation used the term "forest products,"* not "timber." Timber has been defined, in the absence of modifying terms or special trade usage, as "... trees of a size suitable for manufacture into lumber for use in building and allied purposes." *M. & I. Timber Co. v. Hope Silver-Lead Mines, Inc.,* 91 Idaho 638, 428 P.2d 955 (1965); *Arbogast v. Pilot Rock Lumber Co.,* 215 Or. 579, 336 P.2d 329 (1959). Another term, "merchantable timber," would be more specific than "timber." But neither of these terms was used; rather *"forest products," a much broader term than timber or merchantable timber, was used.*

The above definitions and analysis lead to certain conclusions. First, the amended law requires payment for *forest products* delivered to the point of scaling by *gross measurement.* Gross means without deduction for defect. **A cull is not exempted** from *forest products* and is in fact usable for many forest products under varying circumstances. The result is that cull logs are forest products under the scaling law and must be paid for by gross measurement upon delivery for scaling.

*The mill owner is free to negotiate a fair price for forest products delivered* for scaling, *including any loss or damage he may bear because he must pay for culls.* Also, *mill owners* may negotiate by contract for quality control, utilization, merchantability standards, and bonuses and penalties to discourage delivery of culls and other unusable material, as long as the basis thereof is not

determined by a reduction to gross scale. (Emphasis added.)

What is required here is the adaptation of that legal opinion to the facts of this case where there was no contract between the logger and the mill. As Attorney General Leroy pointed out, it is the *mill* which may negotiate with the logger, and ordinarily that is the case. The controversy here is between Pottala, a logger, and Boise Cascade, a financing entrepreneur.

When Boise Cascade decided to prohibit sawlogs from being hauled to the mill, the landings where the logs were decked became the point of delivery as to those logs which would remain there. Wickes would not take them, the reject logs had considerable work and effort in them, and Boise Cascade's contract with the state allowed it an adjustment on the purchase price, depending on mill scale. Nothing prevented Boise Cascade from scaling the logs it wanted to reject at the landing (the point of delivery).[1] Portable scales are not unknown to the industry, as has been well established by the State Police's use of them on North Idaho log haulers years ago, and perhaps continuing to this day. Those portable scales were considered accurate enough to sustain overweight fines.

Just as with excessively high interest, and as with excessively low wages, so has the legislature spoken in the area which is our concern today, compensation for the logging contractor—which in turn will be reflected in wages paid to its employees. In any given case, but using the one before us, had the Wickes mill burned to the ground (as did happen to the Riggins mill), and were it not economical to haul the logs elsewhere, the logger nevertheless should be entitled to be compensated either *pro rata* or *quantum meruit* for work done and services rendered.

## II. ANOTHER VIEW OF THE FACTUAL BACKGROUND

Boise Cascade, in June of 1979, entered into a timber purchase contract with the state of Idaho. It thereafter, following negotiations, under the same date of June 2, 1979, entered separately into two additional contracts which were involved herein. It sold *merchantable saw logs* from that sale to the Wickes Corporation, for delivery to the Wickes mill in Grangeville. It also contracted with Pottala to convert the timber it had purchased into the sawlogs it had promised to Wickes.

The contract with the state of Idaho required of Boise Cascade that the timber removed under the contract was to be manufactured into timber or lumber products in Idaho, presumably also to a pulp mill which might or might not be in Idaho. The State of Idaho set out specific requirements in the timber purchase contract, one of which was that it would *designate* the specific trees which it wanted to remove, and other requirements:

R. SPECIAL TERMS OF SALE:

1. *General Sales Information:*

a. All ponderosa pine, Douglas fir, western larch, grand fir, and Englemann spruce 10 inches diameter breast high or larger and *which are marked with a band of blue paint, will be felled and merchantable sawlogs removed.* All lodgepole pine 8 inches diameter breast high and larger will be cut.

b. The State reserves the right to alter the marking on the sale area to accomplish desired silvicultural objectives.

c. Units A, B and C will be logged during the first year of the contract.

2. *Harvesting Procedures:*

a. Stump height shall not exceed fourteen inches (14") above mean ground level or as specified by the Forester in charge.

b. All timber will be felled in a manner so as to minimize damage to ground, residual timber and reproduction.

---

1. It would be a simple matter to scale at landings and compute the deduction for not making the haul.

c. If excessive damage is being done, the Forester in charge may require that skid trails be predesignated and that all skidding equipment be restricted to skid trails.

d. All landing locations and their size must be approved by the Forester in charge.

3. *Utilization and Merchantability Standards:*

a. Any trees pushed over, scarred or otherwise damaged beyond recovery during the logging operation will be felled and utilized if it *contains ten (10) board feet or more.*

b. All *sawlogs, chunks, tops and longbutts which are at least thirty-three and one-third percent (33⅓%) sound and contain a minimum of ten (10) board feet shall be considered merchantable and shall be utilized.* All trees which contain one or more merchantable sixteen foot (16') sawlog shall be considered merchantable and shall be utilized.

c. Trees of all species shall be cut to a top DIB of six inches (6"). R., pp. 67–68 (emphasis added).

Pottala was to be paid $18.11 per ton delivered at the Wickes mill. Obviously, the state of Idaho had greater concerns than the mere raising of revenue. Thinning and reproduction were obviously important.

Boise Cascade's contract with Tovio Pottala (a logger who had incorporated) created Pottala into an independent logger who would fulfill Boise Cascade's above contractual obligations to the state of Idaho, and fulfill Boise Cascade's contractual obligation to Wickes. Pottala would cut and log (and implicitly remove) the timber *designated as merchantable by the state* as provided in the Boise Cascade-Idaho contract, and deliver it to the Grangeville Wickes mill:

(2) Contractor will cut and log all designated merchantable timber in the Contract Area (herein called Covered Timber) in continuous, diligent and workmanlike manner and in accordance with the best logging practices and in accordance with the terms and provisions of Kennally Cr. State, Timber Sales Contract, herein called "Timber Sale Contract," and deliver Covered Timber in accordance with the terms and conditions hereinafter contained, at its own cost and expense as follows:

3300M

at the rate of 1000M (000) board feet per month, subject to Company's right to adjust the rate of delivery as market conditions at Company delivery points and other factors necessitate, for scaling by Company scaler or a scaler approved by Company. Costs of such scaling shall be borne by company. R., p. 5.

As is readily observed, Boise Cascade reserved the right to alter the monthly rate of delivery. Boise Cascade agreed that it would pay Pottala upon delivery, which delivery sites would be the Wickes Corporation's log yard, and the price would be at $18.11 per ton, and, under paragraph (5), p. 5, of the logging contract, would be logs under Boise Cascade's specification per an attached Exhibit B. Exhibit B is a three-page general statement entitled "LOGGING SPECIFICATIONS, IDAHO LOGGING & ROAD CONTRACTORS." The only applicable section, captioned "Fell & buck," to log specifications are numbered 1, 6, 7, 10, and 11, which are:

1. Logs must meet merchantable standards set out herein before they are acceptable to the Company. Landing scalers and Company representatives are instructed to reject or cull logs which do not meet these cutting rules, either in the woods or on the rail or truck landings or at the mill site.

. . . .

6. Log lengths shall be varied to get the desired lengths for the different mills.

7. All logs should be bucked completely off. Unsafe logs should be measured and bucked at landing. Logs in the bind should be chunked up and so cut as not to slab.

. . . .

10. Before logs are acceptable to delivery points, they must be completely limbed on four sides flush with the bark. 11. Pushovers must be cut to proper specifications. *All designated trees are to be cut.* R., p. 10 (emphasis original). In the final paragraph of the three-page document is a section referring back to the foregoing, to which is added another unexplained sentence:

*Log Standards and Quality*

All timber felled by contractor shall be manufactured into logs meeting the specifications and quality standards set forth in the Log Cutting Instructions and Log Quality Specifications which are attached hereto and incorporated herein. The Wickes Corporation's log specifications and quality standards will be followed and met. R., p. 10.

As far as I can glean from this record, there is no privity of contract, or any relationship whatever between the Wickes Corp. and Pottala.

As I understand Boise Cascade's own statement in the memorandum which it furnished to the trial court, Wickes Corp. began refusing logs delivered by Pottala NOT because of the manner of manufacturing of the logs, BUT because of red rot in the logs. In turn, Boise Cascade flat out directed Pottala as to what logs he could haul to the mill, and what logs, and the time, effort and money into them had to be abandoned—at a substantial loss to Pottala, and nothing whatever out of the coffers of Boise Cascade.

With that analysis, I find it impossible to join a majority opinion which states:

Therefore, it is evident that the Idaho legislature sought to guarantee that loggers were paid more fairly for the logs hauled and delivered for scaling. The legislature did not, however, specifically provide that loggers should be free to deliver all logs, brush, forest growth, and timber in all forms (defective or not) and be paid for the weight of such products. *Further, the legislation did not specifically prohibit the logger and the mill owner from negotiating a stan-*

*dard of merchantability.* Majority opinion, p. 713 (emphasis added).

The last sentence is emphasized to remind the reader that the majority in my view fails to comprehend what the case is all about. Pottala had no negotiations with Wickes Corp. On the other hand, the logging contract which Pottala signed was a form printed by Boise Cascade, and not exactly the product of bargaining by two equal entities. It was more like what Chief Justice Shepard has called a contract of adhesion—in reference to the insurance industry. In *Haener v. Ada County Highway Dist.*, 108 Idaho 170, 697 P.2d 1184 (1985), Chief Justice Shepard noted: "There is no question but that the contract at issue here was drafted by ACHD and submitted to Haener for his signature on a take-it-or-leave-it basis. In cases of ambiguous contract terms, the contract is to be construed in favor of the non-drafting parties, here, Haener." *Id.* at 173, 697 P.2d at 1187 (citations omitted); *Moss v. Mid-America Fire and Marine Insurance*, 103 Idaho 298, 300, 647 P.2d 754, 756 (1982) ("This Court has long recognized that insurance policies are contracts of adhesion, not subject to negotiation between the parties, and hence must be construed most strongly against the insurer."); *see generally* J. Calamari and J. Perillo, *The Law of Contracts* § 9–44 (1977) (hereinafter *Contracts*). Professors Calamari and Perillo define take-it-or-leave-it/adhesion contracts by way of example:

There has been increasing recognition in legal literature that the bargaining process has become more limited in modern society. In purchasing a new automobile, for example, the individual may be able to dicker over price, model, color and certain other factors, but, if he wishes to consummate the contract to purchase, he usually must sign the standard form prepared by the manufacturer (although he is contracting with an independent dealer). He has no real choice. He must take that form or leave it. Such contracts, called contracts of "adhe-

sion," constitute a serious challenge to much of contract theory.

*Contracts, supra,* § 1–4, p. 6 (footnote omitted).

In the context of insurance contracts, Chief Justice Shepard elaborated on the "dilemma" facing those who are presented with nonnegotiable contracts:

> The doctrine of reasonable expectations [also referred to as the "doctrine of adhesion contracts"] proceeds from an acceptance of the fact that most insurance policies are contracts of adhesion. Ordinarily there can be no bargaining over the terms of the contract. The buyer either accepts the policy as written or turns elsewhere where he will usually be confronted with the same dilemma resulting from the same terminology. If the layman actually studies the contract he usually becomes bewildered and/or uncertain as to the terminology. He expects that he will be generally insured and does not anticipate these expectations will be upset by an artfully drawn clause that he will be unable to detect or, in the event detected, will be powerless to modify. Indeed, this court can take notice that usually an insured never sees his policy until after he has paid his premium and the contract has been formed. *Corgatelli v. Globe Life & Accident Ins. Co.,* 96 Idaho 616, 621, 533 P.2d 737, 742 (1975).

Beyond construing such contracts in favor of the nondrafting parties, this and other courts have found it necessary to strike provisions where there was no true mutual assent, or where the provisions are unconscionable or contrary to public policy. *Id.* at 620, 533 P.2d at 743 ("Today we adopt the doctrine of reasonable expectations and hold that an ambiguity in the policy is not a prerequisite for the invocation of the doctrine."); *Williams v. Havens,* 92 Idaho 439, 446, 444 P.2d 132, 139 (1968); *Contracts, supra,* § 9–44.

Consider paragraph (10) of the contract:

> (10) Company reserves the right, and shall have the right and privilege, at Company's sole option, to upon ten (10) days written notice to Contractor, order the Contractor and Contractor agrees to immediately cease its logging operations pursuant to this Contract when, in the Company's sole judgment, the demand for timber products obtainable by Company are not sufficient to allow Company the return necessary from the logs and timber products produced by Contractor at the prices and according to the terms of this Contract. Contractor agrees to deliver only those logs cut and decked in the woods at the time of the receipt of said notice. Company shall pay Contractor for all work actually performed by Contractor prior to receipt of such notice. R., p. 6.

Consider paragraphs (20) and (21):

> (20) In the event Contractor's progress is such that it appears to Company that Contractor will not fully perform his obligations under this Contract by the date set forth for completion, then Company may, at its option, (1) terminate this Contract, or (2) continue the Contract and engage another contractor or contractors or its own employees to perform the work required hereby. Contractor is to be paid only for the reasonable value of the work actually completed. In either event, Contractor shall cooperate fully with Company and with other contractors to the end that the work shall be completed as soon and as economically as possible. Contractor agrees to indemnify Company for any and all loss caused by it as a result of its failure to complete performance under this Contract.

> (21) The specific remedies to which Company may resort under the terms of this Contract are cumulative and are not intended as exclusive of any other remedies to which Company is lawfully entitled in the case of breach or threatened breach of this Contract. Failure of Company to insist upon strict performance of any item of the terms or covenants of this Contract shall not be construed as a waiver of future breach of any covenant or agreement contained herein. R., p. 7.

In my view, it is well established in this state that existing statutory law, especially that which is protective of contract rights, is inherent in any contract—whether given specific mention or not. We held as much in *Robinson v. Joint School District No. 150*, 100 Idaho 263, 265, 596 P.2d 436, 438 (1979):

> This Court has held that "it is axiomatic that extant law is written into and made a part of every written contract." *Fidelity Trust Co. v. State*, 72 Idaho 137, 237 P.2d 1058 (1951). *See also Long v. Owen*, 21 Idaho 243, 121 P. 99 (1912). It appears to be the law in almost every state, if not all, that existing law becomes part of a contract, just as though the contract contains an express provision to that effect (unless a contrary intent is disclosed). 17 Am.Jur.2d *Contracts* § 257 (1964).

The remedial 1978 legislation for the beneficial protection of loggers is part and parcel of the contract, and, as a matter of sound public policy, prevails over and above that to which the parties may have agreed—but which is contrary to and in frustration of legislative intent.

### III.

Nor can I agree with the Court's all too summary disposition of the trial court's failure to instruct on the issues which were tried. The majority may be correct, but there is certainly an obligation on the part of the Court to the litigants to explain how it arrives at its stated conclusion. I greatly doubt that the interested reader will understand what instructions Pottala believes itself entitled to. For certain, no one knows from a reading of the majority opinion, which, after all, is the opinion for the Court, which instructions were given, which were refused, which were covered, and the rationale by which an issue on equally important as the Log Scaling Act is found in favor of Boise Cascade.