[No. D049257. Fourth Dist.; Div. One. Mar. 26, 2007.]

INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
TAWNDRA WILLIAMS et al., Real Parties in Interest.

**COUNSEL**

Luce, Forward, Hamilton & Scripps, Peter H. Klee and John T. Brooks for Petitioner.

No appearance for Respondent.

Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, Leonard B. Simon, Timothy G. Blood, Kevin K. Green; Robbins, Umeda & Fink and Brian J. Robbins for Real Party in Interest Tawndra Williams.

OPINION

**McDONALD, J.**—Tawndra Williams filed a class action against defendant Interinsurance Exchange of the Automobile Club (Exchange) for breach of contract and other causes of action. She alleged Exchange, in violation of Insurance Code section 381, subdivision (f),[1] did not state in the automobile policy issued to her the fee it charges insureds for paying the policy annual premium in installments.

Exchange filed a petition for a peremptory writ of mandate challenging the trial court's orders (1) granting Williams's motion for summary judgment and (2) denying Exchange's motion for summary judgment or, in the alternative, summary adjudication. Exchange contends: (1) The trial court erred by interpreting the term "premium," as used in section 381, subdivision (f), to include fees imposed for installment payments of the annual premium; (2) Williams agreed to pay the fees disclosed by Exchange on her billing statement; (3) it substantially complied with section 381, subdivision (f); and (4) even if it violated section 381, subdivision (f), there are triable issues of material fact that preclude summary judgment for Williams. Because we conclude the term "premium," as used in section 381, subdivision (f), does not include charges imposed for making payments of the annual premium in installments, Exchange did not violate that statute and therefore Williams is not entitled to summary judgment in her class action against Exchange and Exchange is entitled to summary judgment against Williams.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2002, Williams obtained an automobile insurance policy (Policy) from Exchange. She paid the Policy's annual premium in one lump sum. In January 2003, on renewal of the Policy she again paid the Policy's annual premium in one lump sum.

In December 2003, Exchange mailed to Williams a renewal declarations page for the Policy and an accompanying billing statement for the annual renewal period beginning in January 2004. The declarations page set forth the "grand total" premium due of $1,049 and, after deduction of a policyholder's dividend of $63, required Williams to pay a "net total" premium of $986 to renew her policy for another year.[2] The accompanying billing statement gave

---

[1] All statutory references are to the Insurance Code unless otherwise specified.

[2] The declarations page itemized the amount of premium attributed to each risk covered by Exchange: (1) $213 for bodily injury liability; (2) $146 for property damage liability; (3) $163 for comprehensive physical damage; (4) $489 for collision physical damage; and (5) $38 for uninsured motorist coverage, for a total premium of $1,049 (before deduction of the policyholder's dividend).

Williams the option of paying the $986 annual net premium in either one lump sum or nine monthly installments, subject to additional charges for interest at a rate of 17.99 percent per year and requiring payment of only the first installment of $53.60. Williams read the billing statement, understood an election to pay the annual premium in installments would subject her to interest charges, and elected to pay the annual premium in installments rather than in one lump sum.

In December 2004, Exchange mailed to Williams a renewal declarations page for the Policy and an accompanying billing statement for the renewal period beginning in January 2005. The declarations page set forth the "total annual" premium due of $913 and, after deduction of a policyholder's dividend of $67, required Williams to pay a "net" premium of $846 to renew her policy for another year.[3] The accompanying billing statement gave Williams the option of paying the $846 annual net premium in either one lump sum or nine monthly installments, subject to additional charges for interest at a rate of 18 percent per year and requiring payment initially of only the first installment of $34.48. Williams again elected to pay the annual premium in installments rather than in one lump sum.

On October 6, 2004, Williams, on behalf of herself, others similarly situated, and the general public, filed the instant complaint against Exchange alleging causes of action for: (1) breach of contract; (2) committing an unlawful business act or practice in violation of Business and Professions Code section 17200 et seq.; (3) violating the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.); (4) unjust enrichment; and (5) money had and received. The premise for each cause of action was Exchange's alleged wrongful charging and receipt of a fee for payment of annual premiums in installments, a "premium" not stated in its policies in violation of section 381, subdivision (f).

On March 15, 2005, the trial court overruled Exchange's demurrer to the complaint. The trial court subsequently granted Williams's motion to represent the class of all Exchange automobile insurance policyholders who paid installment charges after October 6, 2000.

On or about August 5, Williams filed a motion for summary judgment or, in the alternative, summary adjudication. On August 12, Exchange filed its

---

[3] The declarations page itemized the amount of premium attributed to each risk covered by Exchange: (1) $189 for bodily injury liability; (2) $147 for property damage liability; (3) $118 for comprehensive physical damage; (4) $374 for collision physical damage; (5) $51 for car rental physical damage; and (6) $34 for uninsured motorist coverage, for a total premium of $913 (before deduction of the policyholder's dividend).

motion for summary judgment or summary adjudication. On October 26, pursuant to Exchange's request, the trial court stayed the proceedings and referred to the California Department of Insurance (DOI) the question of "[w]hether installment fees [constitute a] premium as that term is used in [section] 381[, subdivision] (f)."

On April 25, 2006, the DOI issued an opinion finding "the term 'premium' has several different (and sometimes conflicting) meanings depending upon the context in which it is used." It discussed the various meanings of the term "premium" in actuarial, accounting, industry practice, taxation, DOI rate approval, and other statutory contexts. Apparently finding those other meanings unhelpful in determining the meaning of the term "premium" for section 381, subdivision (f) purposes, the DOI reasoned:

"[T]he primary purpose of § 381 (as specifically stated for the automobile line of insurance in § 383.5) is to prevent fraud and mistake by requiring insurers to list the basic terms of the contract. Accordingly, it is the Commissioner's view that policyholders would be less likely to be defrauded or mistaken about the amount of premium if that term is defined in the broadest sense, in the typical way policyholders view their installment payments (i.e., the total price of obtaining coverage, including the installment fee). If that overall price varies depending on the existence of an installment fee, a policyholder will be less likely to be mistaken about the cost of insurance if the policy discloses the nature and amount of that variation.

"This interpretation is consistent with 10 CCR § 2360 [*sic*] . . . , which was promulgated to make certain that insurance companies charge policyholders the lowest available price for insurance coverage. For such a figure to be meaningful, the regulation uses a liberal definition that includes 'all other items which change the amount the insurer charges to the insured,' which presumably would include installment fees. The same reasoning applies here." Accordingly, the DOI concluded: "[T]he purpose of § 381 was not to calculate rates, determine tax liability, or assess the financial solvency of insurers, but to mandate the disclosure of material insurance contract terms, including the price. For the above reasons, the Commissioner concludes that installment fees are [a] premium under § 381, in the private passenger automobile context." The DOI then noted: "The Commissioner is giving consideration to promulgating regulations and/or proposing legislation to clarify what charges must be disclosed under premium and to address other issues raised by this referral."

On August 3, the trial court granted Williams's motion for summary judgment and denied Exchange's motion for summary judgment or summary adjudication. The court stated:

"In reaching this ruling, the Court has given the Department of Insurance's ('DOI') [opinion] some deference. In *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031], where, in addressing the issue of relying [on] an administrative agency's interpretation of a statute, the Court said, 'Because an interpretation is an agency's *legal opinion,* however "expert," rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference.' Thus, this Court is not precluded from giving some degree of deference to the DOI's decision in this matter.

"The decided law supports the conclusion that defendant should have included the installment fees in the premium. In *Allstate Ins. Co. v. State Board of [Equal.]* (1959) 169 Cal.App.2d 165, 168 [336 P.2d 961], the court stated, ' "Premium" in the law of insurance means the amount paid to the company for insurance. [Citation.]' The *Allstate* court held that, 'The "installment payment fee" . . . was "actually given by the insured for his insurance." [Citation.]' (*Id.* at p. 173.)

"The reasoning of the *Allstate* case applies here. Defendant requires payment of the installment fee as a condition of receiving insurance. Thus, the installment fees are part of the amount paid to the company for insurance. (*Allstate, supra,* 169 Cal.App.2d at p. 168.) Failure to specify those fees in the policy is a violation of Insurance Code section 381, subdivision (f). This violation forms the basis for each of plaintiffs' causes of action." The court then addressed each of Williams's five causes of action, concluding she proved her entitlement to relief under each one.

On August 24, Exchange filed the instant petition (Petition), requesting we issue a peremptory writ of mandate requiring the trial court to vacate its order granting Williams's motion for summary judgment and denying Exchange's motion for summary judgment or summary adjudication and to issue a new order denying Williams's motion for summary judgment and granting Exchange's motion for summary judgment. On November 21, we issued an order to the trial court to show cause why the relief requested by

the Petition should not be granted. We subsequently issued an order allowing Williams to file a return to the Petition and Exchange to file a reply. We have received and considered those documents, together with the Petition and its accompanying exhibits.

## DISCUSSION

### I

### *Grounds for Writ Review*

Exchange contends we should consider the Petition's merits even though a final judgment has not yet been entered because if it waited to challenge that judgment on appeal, it would be required to post an appellate bond costing millions of dollars, which could not be recovered from Williams were its appeal successful.[4]

Code of Civil Procedure section 1086 provides: "The writ [of mandate] must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. . . ." To obtain writ review, a petitioner generally must show his or her remedy in the ordinary course of law is inadequate or that petitioner would suffer irreparable injury were the writ not granted. (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 113–114 [40 Cal.Rptr.2d 839, 893 P.2d 1160]; *City of Half Moon Bay v. Superior Court* (2003) 106 Cal.App.4th 795, 803 [131 Cal.Rptr.2d 213].) However, discretionary writ review may nevertheless be appropriate "where it is necessary to resolve an issue of first impression promptly and to set guidelines for bench and bar. [Citations.]" (*Rodrigues v. Superior Court* (2005) 127 Cal.App.4th 1027, 1032 [26 Cal.Rptr.3d 194]; see also *Elden v. Superior Court* (1997) 53 Cal.App.4th 1497, 1504 [62 Cal.Rptr.2d 322] ["[W]rit review is permissible here since the petition raises a novel issue of law."].) Furthermore, writ review may be appropriate to "prevent a needless and expensive trial and reversal [citation]." (*Coulter v. Superior Court* (1978) 21 Cal.3d 144, 148 [145 Cal.Rptr. 534, 577 P.2d 669], superseded by statute on another ground as noted in *Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398, 412, fn. 6 [1 Cal.Rptr.3d 762].) It may also be appropriate if the issues involved are of "widespread interest" (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 816 [210 Cal.Rptr. 211, 693 P.2d 796]) or if "resolution of the issue would result in a final disposition as to the petitioner" (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 182 [123 Cal.Rptr.2d 637]).

---

[4] Without citation to any supporting document, Exchange asserts Williams is seeking over $200 million in damages for her represented class.

Based on Exchange's representation regarding the substantial cost of an appeal bond were Williams to obtain a judgment awarding her represented class the amount she apparently seeks, it would seem improbable Exchange could recover that cost after a successful appeal of the judgment and therefore its remedy in the ordinary course of law may be inadequate. In any event, assuming arguendo Exchange has not shown its remedy on appeal would be inadequate, we nevertheless conclude one or more of the exceptional circumstances discussed above apply and warrant discretionary writ review in this case. Both parties agree the question of the meaning of the term "premium," as used in section 381, subdivision (f), is one of first impression. Because section 381 presumably is a consumer protection statute affecting all Californians who obtain automobile insurance, that issue also is one of widespread interest. Therefore, we exercise our discretion to reach the merits in this case.

## II

### *Summary Judgment Standard of Review*

"[A]fter a motion for summary judgment has been granted [by a trial court], [an appellate court] review[s] the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

Aguilar clarified the standards that apply to summary judgment motions under Code of Civil Procedure section 437c. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at pp. 843–857.) Generally, if all the papers submitted by the parties show there is no triable issue of material fact and the " 'moving party is entitled to a judgment as a matter of law' (Code Civ. Proc., § 437c, subd. (c))," the court must grant the motion for summary judgment. (*Aguilar, supra*, at p. 843.) Code of Civil Procedure section 437c, subdivision (*o*) provides that a cause of action has no merit if: (1) one or more elements of that cause of action cannot separately be established; or (2) a defendant

establishes an affirmative defense to that cause of action. Code of Civil Procedure section 437c, subdivision (p)(2) states: "A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." *Aguilar* made the following observations:

"First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . .

"Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. . . .

"Third, and generally, how the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial. . . . [I]f a defendant moves for summary judgment against . . . a plaintiff [who would bear the burden of proof by a preponderance of the evidence at trial], [the defendant] must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at pp. 850–851, fns. & citation omitted.) Summary judgment law in California no longer requires a defendant to *conclusively* negate

an element of a cause of action. (*Id.* at p. 853.) It is sufficient for a defendant "to show that the plaintiff cannot establish at least one element of the cause of action," which the defendant can do "by showing that the·plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Id.* at pp. 853–854.) "Summary judgment law in this state . . . continues to require a defendant moving for summary judgment to present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Id.* at p. 854, fn. omitted.) *Aguilar* stated: "To speak broadly, all of the foregoing discussion of summary judgment law in this state, like that of its federal counterpart, may be reduced to, and justified by, a single proposition: *If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment.* In such a case, . . . the 'court should grant' the motion 'and avoid a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device. [Citations.]" (*Id.* at p. 855, italics added.)

On appellate review of an order granting or denying a motion for summary judgment, "we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] 'The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. [Citation.] Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' [Citations.]" (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202 [119 Cal.Rptr.2d 160].)

## III

### *The Meaning of the Term "Premium" As Used in Section 381, Subdivision (f)*

Exchange contends the trial court erred by granting Williams's motion for summary judgment and denying its motion for summary judgment or sum-

mary adjudication because the court erroneously concluded the term "premium," as used in section 381, subdivision (f), includes the fee charged for making payments of the annual premium in installments.

## A

Section 381, enacted in 1935, provides:

"*A policy shall specify*:

"(a) The parties between whom the contract is made.

"(b) The property or life insured.

"(c) The interest of the insured in property insured, if he is not the absolute owner thereof.

"(d) The risks insured against.

"(e) The period during which the insurance is to continue.

"(f) Either: [¶] (1) *A statement of the premium*, or [¶] (2) If the insurance is of a character where the exact premium is only determinable upon the termination of the contract, a statement of the basis and rates upon which the final premium is to be determined and paid." (Italics added.)[5] Neither section 381 nor any other provision of the Insurance Code defines the term "premium." Furthermore, the parties have not cited, nor have we found, any case that interprets the term "premium" as used in section 381, subdivision (f). Accordingly, it is a question of first impression whether the term "premium," as used in section 381, subdivision (f), includes the fee charged for making payments of the annual premium in installments.

■ "Our task in interpreting a statute 'is to ascertain and effectuate legislative intent. [Citations.]' [Citation.] In order to do so, '[w]e turn first to the words of the statute themselves, recognizing that "they generally provide the most reliable indicator of legislative intent." [Citations.] When the

---

[5] In a related provision, section 383.5 states: " 'Document,' as used in this section, means a policy or a certificate evidencing insurance under a master policy. The policy or certificate shall conform to Section 381 and shall segregate the premiums charged for each risk insured against. The certificate, *in lieu of specifying the risks insured against*, may designate them by name or by description. 'Document' also includes the applicable policy form and a subsequently issued declarations page conforming to Section 381 or an endorsement. [¶] . . . [¶] The purpose of this section is to prevent fraud or mistake in connection with the transaction of insurance covering motor vehicles . . . ."

language of a statute is "clear and unambiguous" and thus not reasonably susceptible of more than one meaning, " ' " 'there is no need for construction, and courts should not indulge in it.' " ' " [Citations.]' [Citation.]" (*People v. Leal* (2004) 33 Cal.4th 999, 1007 [16 Cal.Rptr.3d 869, 94 P.3d 1071].) Alternatively stated, under the rules of statutory construction, "[i]t is settled that ' "[w]e are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.]" ' [Citation.] Stated otherwise, '[w]hen statutory language is thus clear and unambiguous there is no need for construction, and courts should not indulge in it.' [Citations.] [¶] We have declined to follow the plain meaning of a statute only when it would inevitably have frustrated the manifest purposes of the legislation as a whole or led to absurd results. [Citations.]" (*People v. Belleci* (1979) 24 Cal.3d 879, 884 [157 Cal.Rptr. 503, 598 P.2d 473], superseded by constitutional amendment on another ground as noted in *People v. Moore* (1988) 201 Cal.App.3d 877, 885 [247 Cal.Rptr. 353].) "It is our task to construe, not to amend, the statute. 'In the construction of a statute . . . the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or omit what has been inserted . . . .' [Citation.] We may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].)

**B**

▮ We conclude the fee Exchange charges for making payments of the annual premium in installments is interest for the time value of money and the plain and ordinary meaning of the term "premium," as used in section 381, subdivision (f), does *not* include interest charged for the time value of money. It is commonly understood that a premium is the amount paid for certain insurance for a certain period of coverage.[6] For example, in this case Exchange charged Williams an annual premium of $986 for renewal of her automobile insurance coverage for the period from January 2004 through January 2005. As section 480 confirms, a premium is to be paid on commencement of the period of insurance coverage. Section 480 provides: "An insurer is entitled to payment of the premium as soon as the subject matter insured is exposed to the peril insured against." Therefore, in the case of an annual period of renewal of insurance coverage, an insurer is entitled to payment of the annual premium in one lump sum at the beginning of the

---

[6] One court noted: "[T]he plain and ordinary meaning of the word premium is the consideration paid by an insured to an insurer for a contract of insurance." (*Fidelity Sec. Life Ins. v. Director of Rev.* (Mo. 2000) 32 S.W.3d 527, 531.)

policy period.[7] (§ 480.) To the extent an insurer provides an insured with the option of paying that one lump sum in installments of partial premium payments together with interest on the unpaid premium balance, the interest charged for the time value of money for the option of making payments of premium over time is *not* considered part of the premium paid for insurance coverage.

In this sense, a premium is analogous to the principal amount of a loan. In a loan situation, the principal loan amount is often paid in installments of partial principal payments together with interest accrued on the unpaid principal balance. In that context, it is commonly understood, and cannot reasonably be argued otherwise, that payment of the interest charged is not payment of part of the unpaid principal amount, but rather for the time value of the unpaid principal amount. The same concept of time value of money applies in this case, in which Exchange provided Williams with the option of paying her annual lump sum premium in installments of partial premium amounts together with interest on the unpaid premium balance.[8]

Accordingly, in the circumstances of this case, the interest charged by Exchange for use of its installment payment option does *not* constitute a "premium," as used in section 381, subdivision (f), and therefore was not required to be disclosed in its declarations page or elsewhere in the Policy. Because the term "premium," as used in section 381, subdivision (f), is clear and unambiguous, it is not reasonably susceptible to the interpretation proffered by Williams and we need not engage in further statutory construction. (*People v. Leal, supra,* 33 Cal.4th at p. 1007; *People v. Belleci, supra,* 24 Cal.3d at p. 884.)

## C

Although we do not rely on cases from other jurisdictions in reaching our decision in this case, we note that courts in another state have considered the term "premium" in a like manner. One court stated: "The installment fees are paid not to procure an indemnification contract, but for the privilege of paying the premium over time." (*Blanchard v. Allstate Ins. Co.* (La.Ct.App. 2000) 774 So.2d 1002, 1006.) Accordingly, under the applicable Louisiana statute,

---

[7] Contrary to Williams's assertion, the fact that Exchange may cancel an insurance policy for nonpayment of an installment when due does not make that policy "pay-as-you-go" with a policy period commensurate with each installment period. Rather, the policy period remains as stated in the policy (e.g., one year as in this case).

[8] Although we use the loan situation as an analogy for purposes of explaining the time value of money in this case, we do *not* conclude that an insurance premium is a loan or other type of debt or that Williams, as an insured paying her annual premium on an installment basis, would be considered a debtor of Exchange.

*Blanchard* concluded "these [installment] fees need not be disclosed on the policy." (*Ibid.*) *Cacamo v. Liberty Mut. Fire Ins. Co.* (La.Ct.App. 2004) 885 So.2d 1248 found *Blanchard*'s reasoning "sound" and reached the same conclusion. (*Cacamo,* at p. 1256.)

### D

Williams does not cite any California case (or apposite case from another jurisdiction) holding the term "premium," as used in section 381, subdivision (f), or otherwise for insurance policy disclosure purposes, includes interest charged for the time value of money for the option of making payments of premium over time.[9] Although she cites, as the trial court did, *Allstate Ins. Co. v. State Board of Equal., supra,* 169 Cal.App.2d 165 as authority supporting that position, *Allstate* is distinguishable because it interpreted the term "gross premiums" for taxation purposes and, in any event, involved inapposite. facts to this case. *Allstate* stated: " 'Premium' in the law of insurance means the amount paid to the company for insurance. [Citation.]" (*Id.* at p. 168.) In the context of taxation of insurance companies, "[t]he gross premium, or the amount charged in a contract of insurance, ordinarily includes two elements, that is, the net premium and the loading. The loading, or the amount arbitrarily added to the net premium, is intended to cover the expenses of the company. In a stock company it may also be a source of profit; and in a mutual company, a source from which dividends may be paid to the insured. [Citations.]" (*Ibid.*) Because "[t]he expense of administering the insurance is a component of premium," *Allstate* reasoned that "[r]eimbursement of the additional expense resulting from selling the insurance on an installment basis is an essential element of the gross premium." (*Id.* at p. 173.) In its circumstances involving an installment payment fee charged solely to recover the additional costs resulting from the optional installment payment program, *Allstate* stated: "The sole basis for the imposition of the 'installment payment fee' and the determination of its amount was the expense to the company of the additional installment collections. Plaintiff made the charge of the 'installment payment fee' directly to the insured in order that the increase of its expense from acceptance of installment premiums be passed directly to the insured. The option to the insured was whether he wanted to pay in installments. If he did, he was required to pay the installment payment charge. . . . The 'installment payment

---

[9] *Sheldon v. Am. States Preferred Ins.* (2004) 123 Wn.App. 12 [95 P.3d 391], cited by Williams, is inapposite because it involved a Washington statute that broadly defined the term "premium" for insurance policy disclosure purposes. (*Id.* at p. 392, fn. 2 [" 'premium' [defined] as 'all sums charged, received, or deposited as consideration for an insurance contract or the continuance thereof.' "].) More importantly, *Sheldon* expressly did not decide the question whether a $2 installment fee constituted a "premium" under that Washington statute, stating: "American States does not assign error to the trial court's ruling that the fee constitutes premium. We therefore do not decide this issue." (*Id.* at p. 393, fn. 10.)

fee' was an item of expense loading to cover the additional cost of the installment premium plan, and was in the same category as the expense loading in the cash premium. . . . The expense incident to the installment payment plan does not differ in character from other expenses included in premium. The entire cost to the policyholder arising out of the issuance and performance of the contract of insurance constitutes the taxable premium." (*Ibid.*)[10] *Allstate* concluded that, in its circumstances, "gross premiums" for taxation purposes included installment payment fees based solely on the additional costs incurred by an insurance company in offering an installment payment program. (*Allstate Ins. Co. v. State Board of Equal., supra*, 169 Cal.App.2d at pp. 173–174.)

*Allstate* is inapposite to this case because here the installment charges in question are not based on the additional costs incurred by Exchange in offering an installment payment program, but are based solely on the time value of money for use of the option of making payments of premium in installments (i.e., interest on the amount of the unpaid premium balance).[11] In Williams's statement of disputed material facts in opposition to Exchange's motion for summary judgment, she admits it is "[u]ndisputed" that "Exchange's administrative costs—including the cost of collecting premiums paid in installments—are included in the premium amount approved by the DOI (and listed on policyholders' declarations pages), on which the Exchange does pay gross premiums tax."[12]

Although *Mercury Casualty Co. v. State Bd. of Equalization* (1983) 141 Cal.App.3d 43 [190 Cal.Rptr. 72] also is distinguishable from this case because

---

[10] *Allstate* also stated: "The amount of the 'installment payment fee' was determined by cost accounting and was imposed to cover additional bookkeeping expense, and the collection expense ensuing from the necessity of additional entries in the accounts and billings resulting from the exercise of the installment payment plan." (*Allstate Ins. Co. v. State Board of Equal., supra*, 169 Cal.App.2d at p. 166.)

[11] Therefore, to the extent other cases cited by Williams approved or followed *Allstate*, those cases are also inapposite. (See, e.g., *Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 660 [186 Cal.Rptr. 578, 652 P.2d 426]; *Interinsurance Exchange v. State Bd. of Equalization* (1984) 156 Cal.App.3d 606, 614 [203 Cal.Rptr. 74].)

[12] As supporting evidence for that statement of undisputed material fact, Exchange cites the declaration of John Boyle, executive vice-president of ACSC Management Services, Inc., which is Exchange's attorney-in-fact. In his declaration, Boyle states: "At all times during the class period, *the Exchange has employed an interest-based auto installment finance charge* (as opposed to a flat fee charge). In applying to the DOI for approval of a rate, *the Exchange includes the cost of collecting all premiums—including the cost of collecting premiums paid in installments and of otherwise administering the installment payment program—in the calculations that support its rate application.* The result is that the rates reviewed and approved by the DOI—which rates result in *the premiums specified on each policyholder's declaration page— already reflect the cost of administering the installment payment program.* The Exchange pays gross premiums tax on all the premiums collected pursuant to the DOI-approved rates." (Italics added.)

it interpreted the term "gross premiums" in the context of taxation of insurance companies, it, unlike *Allstate*, involved interest income that an insurance company received from installment notes and therefore is more closely analogous to the circumstances in this case. (*Mercury*, at pp. 44–45.)[13] *Mercury* stated:

"Plaintiff offers to prospective insureds the option of either paying, in advance, in cash, the annual premiums on policies written by it, or of paying part of such premiums in cash and partly by an installment note, for the balance. In the latter case, the insured is charged an amount calculated to cover the increased overhead to plaintiff for handling the notes and collecting them, *plus a sum equal to interest at the going rate on the principal of the notes.*

"Plaintiff treats the face of the note as part of the 'gross premium' and pays the 'gross income' tax thereon; it also treats the 'service charge' as part of the premium and pays the tax thereon. *It regards the interest charged as not being part of the 'gross premium'* and, in this litigation, resists the board's position that it is a third element of the 'gross premium.' *We agree with the plaintiff.*" (*Mercury Casualty Co. v. State Bd. of Equalization, supra,* 141 Cal.App.3d at pp. 44–45, italics added.) *Mercury* reasoned: "[I]n those cases where an insured pays the entire advance premium in cash, plaintiff could, and would, invest the 'nonload' part of the premium and earn a nontaxable income therefrom. *It is the position of plaintiff* that, in computing the gross premium[,] it has satisfied its full obligation by its treatment of the 'service charge' and the face value of the note as part of the 'gross premium' and *that the interest it collects is no more than income from an investment—i.e., a loan to the insured. We agree.*" (*Id.* at p. 45, italics added.) *Mercury* expressly concluded *Allstate* was factually inapposite to its case because "[i]t did not deal with any 'interest' charge on the delayed installments." (*Mercury,* at p. 45.)

Therefore, although we do not rely on taxation cases in interpreting the meaning of the term "premium" as used in section 381, subdivision (f), to the extent those cases are analogous because they interpreted the term "gross premiums," we conclude they support, rather than contradict, our conclusion above. In particular, we conclude *Mercury Casualty Co.,* which effectively held interest income is not part of "gross premiums" for taxation purposes, is more

---

[13] For purposes of this opinion, we presume, as Williams asserts, the installment notes in *Mercury* constituted "premium financing" notes (or "premium finance agreements") within the meaning of section 778 et seq. and therefore their periodic finance charges were, unlike the interest charges imposed under the installment program in this case, subject to the specific statutory disclosure requirements of section 778.3. Despite those factual and legal differences, we nevertheless conclude it is more closely analogous to this case than *Allstate* is because *Mercury* focuses on interest charges.

closely analogous to this case than is *Allstate Ins. Co.*, cited by Williams and by the trial court in support of its order.[14]

Similarly, although Williams cites two California Attorney General opinions in support of her position, both opinions related to the definition of "gross premiums" in the context of insurance company taxation. (See 9 Ops.Cal.Atty.Gen. 257 (1947); 58 Ops.Cal.Atty.Gen. 768 (1975).) Therefore, those opinions are factually and legally inapposite and do not persuade us to reach a different conclusion in this case.

## E

Williams also argues we should give substantial deference to the DOI's opinion dated April 25, 2006, as discussed and quoted above, on the proper interpretation in this case of the term "premium," as used in section 381, subdivision (f). Apparently finding the meanings of the terms "premium" and "gross premiums" in taxation, rate making, and other contexts unhelpful in determining the meaning of "premium" for section 381, subdivision (f) purposes, the DOI reasoned: "[T]he primary purpose of § 381 (as specifically stated for the automobile line of insurance in § 383.5) is to prevent fraud and mistake by requiring insurers to list the basic terms of the contract. Accordingly, it is the Commissioner's view that policyholders would be less likely to be defrauded or mistaken about the amount of premium if that term is defined in the broadest sense, in the typical way policyholders view their installment payments (i.e., the total price of obtaining coverage, including the installment fee). If that overall price varies depending on the existence of an installment fee, a policyholder will be less likely to be mistaken about the cost of insurance if the policy discloses the nature and amount of that variation." Accordingly, the DOI concluded: "[T]he purpose of § 381 was not to calculate rates, determine tax liability, or assess the financial solvency of insurers, but to mandate the disclosure of material insurance contract terms, including the price. For the above reasons[,] the Commissioner concludes that installment fees are premium under § 381, in the private passenger automobile context." In deciding the parties' motions for summary judgment, the trial court expressly gave "some deference" to the DOI's opinion.

However, the trial court erred in giving deference to the DOI's opinion. The DOI's opinion was not based on any long-standing administrative construction of section 381, subdivision (f), on the meaning of the term

---

[14] Williams also cites *State v. Allstate Insurance Company* (1960) 221 Ore. 371 [351 P.2d 433], overruled on another ground by *Parr v. Department of Revenue* (1976) 276 Ore. 113 [553 P.2d 1051, 1053], and *Liberty Mutual Insurance Co. v. State Tax Com'n* (1974) 365 Mass. 411 [312 N.E.2d 559]. However, both of those cases involved the interpretation of "gross premiums" for taxation purposes and are closely analogous to *Allstate*, which we conclude is inapposite to this case.

"premium." On the contrary, it is implicit in that opinion that the DOI had never before expressly addressed the specific issue in this case. As the California Supreme Court stated: "Because the [administrative] policy at issue here is not a formally adopted regulation, and the Board does not claim that its . . . policy constitutes a long-standing administrative construction of [the statute], *we need not defer* to any administrative understanding of the meaning of those [statutory] provisions. *We determine independently* [the meaning of those statutory provisions]." (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 322 [87 Cal.Rptr.2d 423, 981 P.2d 52], italics added.) Alternatively stated, "when, as here, the agency does not have a long-standing interpretation of the statute and has not adopted a formal regulation interpreting the statute, the courts may simply disregard the opinion offered by the agency. [Citation.]" (*State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442, 451 [44 Cal.Rptr.3d 491].) Furthermore, an agency does not have the authority to alter or amend a statute or enlarge or impair its scope. (*Ibid.; Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697]; *First Industrial Loan Co. v. Daugherty* (1945) 26 Cal.2d 545, 550 [159 P.2d 921].) "The ultimate interpretation of a statute is an exercise of the judicial power." (*Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321, 326 [109 P.2d 935].) Accordingly, "a tentative administrative interpretation [of a statute] makes no pretense at finality and it is the duty of this court, when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively, even though this requires the overthrow of an earlier erroneous administrative construction. [Citations.]" (*Ibid.*) Therefore, in this case because the proper interpretation of the term "premium" under section 381, subdivision (f) is a question of law for our independent determination, we are not bound by the DOI's opinion on that question. (*Agnew v. State Bd. of Equalization, supra,* at p. 322.) Furthermore, because the DOI has not issued a formal regulation or had a long-standing opinion on that question (having first expressly addressed it on April 25, 2006, after the trial court referred this issue to the DOI), we do not defer to the DOI's opinion. (*Ibid.; State of California ex rel. Nee v. Unumprovident Corp., supra,* at p. 451.)

Assuming arguendo the DOI's opinion is entitled to *some* deference, the degree of that deference "turns on a legally informed, commonsense assessment of [its] contextual merit." (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th 1, 14.) However, in reaching its opinion in this case, the DOI expressly relied solely on its understanding of the primary purpose of section 381, subdivision (f)—i.e., "to prevent fraud and mistake"—by requiring disclosure of an insurance contract's material terms. The DOI reasoned that primary purpose would be served by construing the term "premium" broadly to include interest charged for the option of making payments of premium over time. However, in so doing, the DOI did not have

any special expertise that we or other courts lack in construing the underlying legislative intent of section 381 or its term "premium." To the extent the purpose of section 381 is to prevent fraud or mistake by requiring disclosure of material terms of an insurance contract, we are in as good a position as the DOI to determine the meaning and scope of the term "premium," as used in that statute. Accordingly, we give little, if any, deference to the DOI's opinion on the instant question. (*Yamaha Corp.*, at p. 14; *Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842, 858–859 [40 Cal.Rptr.3d 653].)

Because, as we concluded above, the plain and ordinary meaning of the term "premium," as used in section 381, subdivision (f), does not include interest charged for the time value of money for utilizing the option of making payments of the annual premium in installments, were we to defer to the DOI's contrary interpretation of that term, it would result in an unauthorized amendment, or enlargement of the scope, of section 381. (*State of California ex rel. Nee v. Unumprovident Corp.*, *supra*, 140 Cal.App.4th at pp. 451–452; *Morris v. Williams*, *supra*, 67 Cal.2d at p. 748; *First Industrial Loan Co. v. Daugherty*, *supra*, 26 Cal.2d at p. 550.) If the Legislature wishes to expand the meaning of the term "premium" beyond its plain and ordinary meaning, then it must amend that statute to expressly define that term to have an extraordinary, broader meaning. However, until that term is otherwise defined, we must interpret it based on its plain and ordinary meaning, as discussed above.

F

In summary, we conclude the plain and ordinary meaning of the term "premium," as used in section 381, subdivision (f), does *not* include interest charged for the time value of money for using the option of making payments of the annual premium in installments.[15] Because the interest charged by

---

[15] In reaching our conclusion, we need not discuss, and do not rely on, other statutes and regulations cited by Exchange or the DOI's purported historical enforcement practices supporting Exchange's position. Furthermore, we do not rely on the rule of lenity that Exchange argues also supports its position. Nevertheless, we note that to the extent the term "premium" is reasonably susceptible to Williams's proposed interpretation, because violation of section 381, subdivision (f)'s disclosure requirements is a misdemeanor offense under section 383, subdivision (a), the rule of lenity presumably would apply to support our interpretation of that term in Exchange's favor, which interpretation presumably is also reasonable. (See, e.g., *People v. Garcia* (1999) 21 Cal.4th 1, 10–11 [87 Cal.Rptr.2d 114, 980 P.2d 829]; *People v. Gardeley* (1996) 14 Cal.4th 605, 622 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 312–313 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; *People v. Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288].) Finally, we note Williams has not provided any evidence on section 381's legislative history (at the time of or since its enactment in 1935) showing the Legislature intended "premium," as used in section 381, subdivision (f), to have a meaning other than that which we have given it in this case.

Exchange for its installment payment option does not constitute a "premium," as used in section 381, subdivision (f), those interest charges were not required by section 381, subdivision (f) to be disclosed by Exchange in its declarations pages or elsewhere in its automobile insurance policies for Williams and the other class members.

## IV

### Remaining Contentions

Because we have decided this case in Exchange's favor based on the ground discussed in part III, *ante*, we need not address Exchange's remaining contentions.[16]

## V

### Summary Judgment for Exchange

Because Exchange did not violate section 381, subdivision (f)'s requirement that it disclose the premium on its declarations page or elsewhere in its policy by not including interest charged for the time value of money for use of the option of making payments of the annual premium in installments, which alleged violation was the premise of each of Williams's causes of action, the trial court erred by granting Williams's motion for summary judgment and denying Exchange's motion for summary judgment. Because Exchange carried its burden to show "that one or more elements of [Williams's] cause[s] of action . . . cannot be established" (Code Civ. Proc., § 437c, subd. (p)(2)), it is entitled to summary judgment in its favor.[17] (Code Civ. Proc., § 437c, subds. (c), (o)(1); *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 853–855.)

---

[16] Although, pursuant to Evidence Code sections 452, subdivision (d), and 459, we grant Exchange's request that we take judicial notice of the stipulated dismissal of the appeal in *Steinbeck v. Mercury Ins. Co.* (Oct. 17, 2006, G035999), we did not consider that appeal or its dismissal in deciding this case.

[17] To the extent Williams argues her breach of contract cause of action is not dependent on a violation of section 381, subdivision (f), Exchange is nevertheless entitled to summary judgment because that cause of action is dependent on her allegation that it charged her interest not included as "premium" in the Policy. Based on our interpretation of the term "premium" in this case, she cannot show Exchange charged her a premium greater than that set forth in her declarations page or elsewhere in the Policy.

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to: (1) vacate its order granting Williams's motion for summary judgment and denying Exchange's motion for summary judgment; and (2) issue a new order denying Williams's motion for summary judgment and granting Exchange's motion for summary judgment. The order to show cause is discharged. The stay of further proceedings in the trial court issued February 1, 2007, is vacated. Petitioner shall recover its costs in this writ proceeding.

Nares, Acting P. J., and Haller, J., concurred.

A petition for a rehearing was denied April 19, 2007, and the petition of real parties in interest for review by the Supreme Court was denied June 27, 2007, S152464.